**Joseph W. COTCHETT, individually and for all other persons similarly situated, Plaintiff,**

**v.**

**AVIS RENT A CAR SYSTEM, INC., National Car Rental System, Inc. and The Hertz Corporation, individually and as representatives of all individuals and corporations which conducted auto rental business in the City of New York in the years 1968 through 1971 and which collected $1.00 surcharges for prospective parking violations, Defendants.**

**No. 72 Civ. 371 HRT.**

United States District Court,
S. D. New York.

Oct. 20, 1972.

**550**

Arnold B. Elkind, New York City, and Robert B. Hutchinson, San Mateo, Cal., for plaintiff.

Proskauer, Rose, Goetz & Mendelsohn by Morton M. Maneker and Michael I.

Wolfson, New York City, for defendant Avis Rent A Car System, Inc.

Kaye, Scholer, Fierman, Hays & Handler by Peter M. Fishbein and Rene H. Reixach, New York City, for defendant The Hertz Corp.

Cadwalader, Wickersham & Taft by P. Jay Flocken and Gerald A. Poch, New York City, for defendant National Car Rental System, Inc.

## OPINION

TYLER, District Judge.

This is an action brought by Joseph W. Cotchett, a California resident, on behalf of himself and all others similarly situated, charging the three principal car rental agencies in New York City, individually and as representatives of all other such agencies as allegedly participated, with conspiring and combining to set an "illegal assessment" or surcharge of $1.00 on all automobile rentals in New York City, in violation of the Sherman and Clayton Acts. 15 U.S.C. §§ 1, 2, and 15 (1972). Plaintiff has demanded trial by jury.

The first stated claim alleges the common "nucleus of operative facts" upon which are based the second, third, and fourth stated claims. It recites that the plaintiff rented an automobile from one of the defendants and paid a $1.00 "charge or surcharge" in connection therewith, "without a disclosure of said surcharge." Complaint, para. *Eighth*. This surcharge is alleged to have been the product of a conspiracy among the car rental agencies, which itself was the product of a local ordinance rendering all car rental agencies jointly and severally liable for parking violations incurred by their customers. New York City Local Law 57 (1968) (now New York City Administrative Code, ch. 4, § 883a–5.0 (1971)). The surcharge is alleged to have been charged from 1968 to January 1, 1972. Complaint, para. *Ninth*. As a result of the conspiracy, the cost of rental of an automobile was

"raised above that which would normally prevail". Complaint, para. *Tenth.* The second stated claim charges the defendants with wilful concealment and failure to disclose the "wrongful" surcharge, Complaint, para. *Fourteenth,* and thus of having defrauded the plaintiffs. The third stated claim alleges an account due from defendants because of the surcharge. The fourth recites that defendants are indebted to plaintiffs on an open book account by virtue of the surcharge.

In their answer, the defendants deny the material allegations of the complaint and assert several counterclaims against the putative class arising out of the "same transactions and occurrences that are the basis of the plaintiff's claims in this action." Brief for Defendants at p. 8. These counterclaims allege that certain members of the plaintiff class are liable to defendants for unpaid parking tickets assessed or assessable against defendants, for uninsured damage to the rented automobiles, for rental bills and for the costs incurred in seeking collection of these. Defendants' estimate of the aggregate damages alleged in the counterclaims amounts to $1,500,000. Brief for Defendants at p. 10. Plaintiff does not estimate damages in his complaint, but alleges that the amount "will become ascertainable by discovery and proof." Complaint, para. *Eleventh.*

The plaintiff class is said to consist of all those persons who paid the $1.00 surcharge in connection with the rental or leasing of an automobile from any of the defendant class members, which include Avis, National, and Hertz as representatives, and all other "individuals and corporations which conducted auto rental business in the City of New York in the years 1968 through 1971 and which collected $1.00 surcharges for prospective parking violations". Complaint, *caption.* Plaintiff estimates his class to number more than 500,000, Complaint, para. *Second*—although in his brief, at page 5, he alleges "on information and belief" that

it numbers over 1,500,000. He also estimates that defendant class numbers more than 100 persons or firms. Complaint, para. *Fourth.* Defendants opine that there are counterclaims against some 60,000 members of the plaintiff class. Supplemental letter for Defendants at p. 3 (4 August 1970).

Plaintiff has moved pursuant to Rule 23(c)(1), F.R.Civ.P., for a determination that his complaint be maintained as a class action. I conclude that this action cannot be maintained as a class action at this time and on the present record.

Although paragraph *First* of the complaint alleges that the action is maintainable under Rule 23(b)(1), the brief for plaintiff at page 5 and the nature of the complaint and answer, as discussed above, indicate that this action must be brought under Rule 23(b)(3), if at all. Thus, it must be determined by this court whether the issues common to the class, as alleged in the complaint, predominate over individual questions, and whether the class action device is "superior to other available methods for the fair and efficient adjudication of the controversy." In my opinion, plaintiff has failed to demonstrate either that issues common to the class predominate over individual questions, or that the class device in this case evidences any superiority over other available methods of adjudication.

On its face, the first stated claim, alleging a conspiracy to fix prices in violation of the antitrust statutes, would seem to establish the common foundation for liability anticipated by Rule 23(b)(3), in which common questions of law and of fact are predominant, and the only real individual issue is that of damages. 3B Moore's Federal Practice ¶ 23.45[2], at 758–759 (2d ed. 1969). Even assuming, however, that a common conspiracy or collective action could be proved, liability would not necessarily follow, for there would still remain the question of the price each individual defendant would have charged but for the

conspiracy. Nowhere does plaintiff allege that the entire $1.00 surcharge is the amount of price "fixed" by the conspirators; as the caption to his complaint indicates, that sum was at least allocated for "prospective parking violations" and the administrative burdens imposed by virtue of the 1968 change in the New York City parking regulations. If the regulations imposed some additional costs on the normal operations of the rental agencies, these amounts would have to be ascertained as to each of the defendants.

More importantly, the non-frivolous counterclaims asserted by defendants against an estimated 60,000 individual members of the putative class, and arising out of the rental transactions forming the basis of the complaint, pose serious questions of individual liability which, at least in their aggregate, threaten to overwhelm the original claims. Defendants argue persuasively that the counterclaims are compulsory and not permissive, since they arise out of the same transactions or occurrences forming the basis of the original complaint, namely the rental transactions. F.R.Civ.P. 13(a). Given the "liberal construction" of the concept of a compulsory counterclaim to include any counterclaim with a logical relationship to the original transaction or occurrence, 3 Moore's Federal Practice ¶ 13.13, at 33–34 (2d ed. 1969), I am inclined to agree with the defendants. At the least, it is difficult to say that the common issues justify a unitary action where, at this early stage, it seems likely that such unity will be substantially splintered by the counterclaims into a myriad of separate trials. See Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970); Caceres v. International Air Transport Association, 46 F.R.D. 89 (S.D.N.Y. 1969), appeal dismissed, 422 F.2d 141 (2d Cir. 1970). Even were the claims to be regarded as merely permissive, however, the administrative difficulties and problems of fairness discussed below would not be obviated. Because of the latter, there is no reason to decide the nature of the counterclaims at this time.

Similar reservations apply as strongly to the second, third, and fourth stated claims, which allege active concealment, failure to disclose, fraud, and reliance. In addition, these allegations raise such individualized questions of law and of fact as to overwhelm whatever kernel of common issues might be involved; with 500,000 to 1,500,000 plaintiffs and over 100 (not all as yet identified) defendants, involving individual dealings, the questions of knowledge of the surcharge, reliance on the alleged misrepresentations, methods of concealment, and failure to disclose to each plaintiff, an adjudication of the "common" question of conspiracy would not advance matters very far at all. Schaffner v. Chemical Bank, 339 F.Supp. 329 (S.D.N.Y.1972); Morris v. Burchard, 51 F.R.D. 530 (S.D.N.Y.1971); Moscarelli v. Stamm, 288 F.Supp. 453 (S.D.N.Y.1968); Advisory Committee's Note, Proposed Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966). Plaintiff argues forcefully that the $1.00 surcharge is to be analogized to a fraudulent prospectus, in that it amounts to a "fraudulent system" which affected all customers in the same manner. But, as the supporting affidavits of defendants demonstrate, there are at least threshhold indications of material variations in the representations and individual reliance concerning the surcharge. In other words, there are strong indications in the present record that plaintiff will be unable to establish the factual basis for his interesting theory.

Nor does it appear that the class action device in this case is superior to other available methods of resolution. While class actions may represent the only available means of redress for consumers whose claims are too small individually to render legal action economically feasible, and while private enforcement of the antitrust laws in consumer

transactions may provide an important deterrent to potential violators, such factors must be weighed, along with all other benefits to the class, against the costs of such an action, in terms of convenience and fairness to all involved. Among other factors to be considered, Rule 23(b)(3) lists the "interest of members of the class in individually controlling the prosecution or defense of separate actions" and "the difficulties likely to be encountered in the management of a class action."

The presence and nature of the counterclaims, in particular, raise the likelihood of a substantial number of class members seeking to be excluded from the action. With the potential recovery on the counterclaims exceeding by far the possible gain from the original action in some cases, it likely will be in the interest of such individuals to "opt out" as soon as is possible. A suit which forces a significant portion of a class to take active steps to exclude themselves hardly seems "fair" to those so affected. Moreover, it is inevitable that some members will not heed the notice and will thus find themselves unwittingly faced with a net judgment against them.

This raises once again the problem of manageability. Because of the counterclaims and of the *res judicata* effect of any class adjudication, individual notice must be sent to the class members. Although the "best notice practicable" required by Rule 23(c)(2) does not always mean individual notice, when class members are readily identifiable and potentially liable to counterclaims asserted by defendants, notice by publication would surely raise problems of due process. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Finally, it should be noted that the defendant class remains to be identified and notified of this action as well, and fundamental notions of fairness apply perforce to any attempt to include them within a class action without such notice.

Added to these problems of notice and of identification are many more which have become characteristic of class actions of this size: a computation of damages necessarily involving calculation of the operational costs of each of the more than 100 defendants in the defendant class; the sheer mechanics of administration, including notice to all class members of the suit; notice of liability and damages if established; the procedure for intervention or exclusion; the filing and proving of ultimate claims; and the final distribution of any recovery. Such considerations impose a heavy burden on plaintiff to demonstrate that a class action is the most efficient manner in which to proceed. Like fairness, efficiency is a relative concept, suggesting a balancing of the costs of litigation to the parties and the public (including the costs involved in foregoing alternative courses of action) against the likely benefits. The amount of recovery on each allegedly illegal transaction in the instant case would be but a fraction of a dollar, trebled. The costs of administration of such a large suit promise to reduce substantially even this recovery. For some class members, in addition, this would be offset by a substantial counterclaim. Finally, as another member of this court recently observed,

"    .    .    .    the notion of utilizing a jury trial in a class suit containing the varied problems certain to abound herein, is enough to chill any further discussion of the required superiority of a class claim over other available methods for the fair and efficient adjudication of the controversy. .    .    . And one might relevantly ask—what public interest would be served by devoting the public's facilities in this way and what just purpose requires such a colossal marshalling of judicial resources and their supporting personnel?" Schaffner v. Chemi-

cal Bank, *supra,* 339 F.Supp. at 337 (Pollack, J.).

Weighing all of these considerations, I find that plaintiff has failed to show that a class suit is superior in terms of fairness or efficiency.

Defendants also strenuously object to the maintenance of this action as a class suit on the grounds that the named individual plaintiff will not " . . . fairly and adequately protect the interests of the class." F.R.Civ.P. 23(a)(4). Although the foregoing discussion of the problems of efficiency and fairness obviate the need to decide this issue, I consider it to be a serious one worthy of at least passing mention. As the record indicates, this suit was originally brought by one Jeremy Pastuszek, with Joseph Cotchett co-counsel with Arnold Elkind. Mr. Pastuszek's wife apparently works for Mr. Elkind. Deposition of Plaintiff Pastuszek, at p. 59. Mr. Cotchett was added as a party plaintiff by stipulation on April 28, 1972 while summary judgment was granted against Mr. Pastuszek; in his place as co-counsel appeared one Robert B. Hutchinson, who is apparently a member of Mr. Cotchett's law firm. Affidavit of Robert B. Hutchinson, Plaintiff's Notice of Motion, verified on May 30, 1972.

The difficulty I have with this situation lies in the fact that the possible recovery of Mr. Cotchett as a member of the class is far exceeded by the financial interest Mr. Cotchett might have in the legal fees engendered by this lawsuit. The propriety of this arrangement is cast further into doubt by the consideration that the individual members of the class are unlikely to receive any significant personal benefit from a successful prosecution of this suit and, indeed, may ultimately have to pay for it through subsequently increased costs of car rental.

Thus, it may well be " . . . that plaintiff has interests antagonistic to those of the remainder of the class." Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2d Cir. 1968). But to my mind there is an even more significant underlying problem created by Rule 23, which in effect provides " . . . small claimants with a forum in which to seek redress for alleged large scale anti-trust violations. . . . " Eisen v. Carlisle & Jacquelin, *supra,* 391 F.2d at 567. It follows that "[i]nsofar as it makes recourse to the courts convenient in situations where that would otherwise be infeasible, the class action encourages litigation." 3B Moore's Federal Practice, *supra,* ¶ 23.45[3] at 802. In sum, in the process of encouraging litigation, a class action also invites solicitation, a factor which has led at least one federal judge to comment:

> "Although some courts say these claims are not brought because plaintiffs believe the potential recovery would be too small to justify the time and expense of litigation, the plain truth is that in many cases Rule 23(b)(3) is being used as a device for the solicitation of litigation. This is clearly an 'undesirable result' which cannot be tolerated." Buford v. American Finance Company, 333 F. Supp. 1243, 1251 (N.D.Ga.1971) (Edenfield, J.).

See also Shields v. Valley National Bank of Arizona, 56 F.R.D. 448 (D.Ariz., 1971); Schaffner v. Chemical Bank, *supra,* 339 F.Supp. at 337; Handler, The Shift From Substantive to Procedural Innovations in Antitrust Suits—The Twenty-Third Annual Antitrust Review, 71 Colum.L.Rev. 1, 4–10 (1971); 3B Moore's Federal Practice, *supra,* at 803 n. 7; 9 C.J.S. Barratry. This problem is one of concern to the entire legal profession, and more so than judicial opinions and scholarly comments thus far have indicated.

For these reasons, I am not satisfied that questions common to the class predominate over questions affecting individual members or that the class device is superior under the circumstances to other available methods of adjudication,

or, for that matter, to no adjudication at all. Plaintiff's motion is denied, and this action, as a class action, is dismissed.

It is so ordered.