**Paul J. BOGOSIAN, Plaintiff,**

v.

**GULF OIL CORPORATION et al.,
Defendants.**

**Louis J. PARISI, Plaintiff,**

v.

**GULF OIL CORPORATION et al.,
Defendants.**

**Civ. A. Nos. 71–1137 and 71–2543.**

United States District Court,
E. D. Pennsylvania.

Dec. 19, 1973.

See also, D.C., 337 F.Supp. 1234.

⚼181

David Berger, P.A., Philadelphia, Pa., for plaintiff.

Frank W. Morgan, Houston, Tex., Hoyt A. Harmon, Jr., Bala-Cynwyd, Pa., for defendants.

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for American Oil Co.

Benjamin M. Quigg, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., John H. Chiles, Houston, Tex., for Exxon Corp.

John E. Blay, Philadelphia, Pa., Charles F. Rice, James L. Burton, New York City, for Mobil Oil Corp.

Ralph W. Brenner, David L. Grove, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Lewis J. Ottaviani, Bartlesville, Okl., for Phillips Petroleum Co.

John T. Clary, Philadelphia, Pa., William Simon, Keith E. Pugh, Jr., William R. O'Brien, Howrey, Simon, Baker & Murchison, Washington, D. C., for Shell Oil Co.

John G. Harkins, Jr., Barbara W. Mather, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Robert M. Dubbs, St. Davids, Pa., for Sun Oil Co.

Henry T. Reath, Duane, Morris & Heckscher, Philadelphia, Pa., Milton Handler, Milton J. Schubin, Allan M. Pepper, Kaye, Scholer, Fierman, Hays & Handler, William R. Slye, New York City, for Texaco, Inc.

L. Carter Anderson, Rawle & Henderson, Philadelphia, Pa., for Cities Service Oil Co.

Edward W. Mullinix, Arthur H. Kahn, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Moses Lasky, Richard Haas, Brobeck, Phleger & Harrison, San Francisco, Cal., for Union Oil Co. of California.

H. Francis De Lone, Richard G. Schneider, Dechert, Price & Rhoads, Philadelphia, Pa., C. Lansing Hays, Jr.,

Hays, Landsman & Head, New York City, for Getty Oil Co.

Robert W. Sayre, Frederick H. Ehmann, Jr., Saul, Ewing, Remick & Saul, Philadelphia, Pa., William E. Jackson, Milbank, Tweed, Hadley & McCloy, New York City, for Amerada Hess Corp.

Allen F. Maulsby, Cravath, Swaine & Moore, New York City, for Chevron Oil Co.

## MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

Plaintiffs seek class action certification on behalf of a nationwide class consisting of all present and former retail gasoline service station dealers who lease or have leased their respective stations from any of the defendant oil companies.[1] The basis of the complaints is that all defendants as landowner-lessors impose illegal tie-in agreements in the leasing of their respective service stations by requiring the lessees to buy and sell only the gasoline supplied by their respective lessors. Plaintiffs[2] contend that they are precluded from purchasing their wholesale gasoline requirements in a free and open market, thereby permitting defendant oil companies to unilaterally impose excessive wholesale prices to the financial detriment of the lessees.

Oral argument for class action certification was first held in January of 1973, at which time plaintiffs' counsel announced that they desired to "streamline" the cases in respect to the nature of the claims and description of the class.[3] Plaintiffs' counsel stated:

> On February 14, 1972, when Mr. Parisi's deposition was taken, he was an Arco lessee-dealer in Phila., Pa. He claims no injury by Atlantic-Richfield Company, the lessor of the Arco station.

1. The complaints name 15 of the major oil producing and distributing companies operating nationwide.

2. Paul J. Bogosian has operated a Gulf station in Watertown, Mass., since 1957 as a lessee of Gulf Oil Company. (Para. 4, Amended Complaint, CA 71–1137). Louis J. Parisi operated an Exxon station in Philadelphia, Pennsylvania, as a lessee of Exxon Corporation from July 1968 to June 1971. (Para. 4, Amended Complaint, CA 71–2543).

3. The original complaints sought class certification for all present, former and *future* service station lessees operating in communities or political subdivisions in the United States exceeding 50,000 inhabitants. The actions were broad based attacks on the dis-

The single, solitary claim in this class action is as follows: The defendant franchisors acting in concert have maintained a uniform policy of requiring all those who lease, sublease or renew such lease or sublease of defendants' service station to do the following things:

First, to license the use of defendant's trademark.

Second, to sell only the defendant's gasoline.

Third, not to sell gasoline purchased from any other source under that trademark.

Fourth, to purchase all such gasoline at prices unilaterally and subjectively determined by the defendant franchisors from time to time.

That, Your Honor, is our claim. All other claims, including those involving real estate monopoly and TBA products, are abandoned.[4]

Because of the drastic alterations in the nature of the claims, as well as the stated intention of joining other major oil companies as parties defendant and the proposed withdrawal of George Hack, as a class-plaintiff, leave to amend was granted, with leave to refile motions for class certification. Thereafter full briefing was filed and additional oral argument heard.

The major thrust of the complaints is that all of the major oil companies "through a course of interdependent consciously parallel action" have engaged in illegal tying agreements in connection with the leasing of company-owned service stations, the effect of which is that the lessee operators are forced to buy their gasoline supplies exclusively from their respective lessors. Jurisdiction is founded on Sections 4 and 16 of the

Clayton Act, 15 U.S.C. § 15 and § 26 and Section 1 of the Sherman Act, 15 U.S.C. § 1.

Plaintiffs contend that they should be permitted to purchase their supplies of gasoline products from any oil company or distributor they choose. They further contend that all gasoline, subject only to minor formula variations, is the same and thus a fungible commodity regardless of by whom it is produced, refined or distributed. Consequently, plaintiffs argue that not only should they be permitted to purchase gasoline from whomever they choose, but they should have the right to sell any brand of gasoline from the lessors' trademarked pumps and tanks and to sell other gasoline under different trademark brand names on the leased premises, subject only to the owners of the trademarks granting licenses to the respective lessees and imposing reasonable quality controls over the sale of the licensors' trademarked brand name gasolines.

Defendants concede that a trademark protection clause in one form or another is contained in every lease agreement or arrangement between the defendant oil companies and their respective lessees.[5] These clauses are the primary basis for plaintiffs' claims of illegal tying agreements. In general, the trademark protection clauses, however worded, prohibit a lessee from selling any gasoline under the lessor's trademarked brand name or from any of the pumps or tanks bearing lessor's trademark or brand name or insignia, unless such gasoline is sold and supplied to lessee by the lessor. Defendants, relying on the Lanham Act, 15 U.S.C. § 1055, 1064 and various state statutes, contend they not only have the right, but also the duty to prohibit the sale of gasoline under a particular trade-

tributive, pricing, leasing and real estate holding practices of the oil industry as related to retail gasoline service station owners, dealers, lessors and operators.

4. Page 32. Notes of Hearing held January 12, 1973.

5. a) Transcript of Sept. 4, 1973, class action oral argument, p. 75.

b) Defendants' memorandum of law opposing class certification, p. 47.

c) Transcript of Jan. 12, 1973, class action oral argument, pp. 71–72.

mark brand name unless such gasoline is supplied by the company owning the trademark and brand name rights.

Plaintiffs contend that all gasoline of a stated octane rating is substantially the same and, therefore, constitutes a fungible commodity.[6] Rather than an absolute prohibition against the sale of one company's gasoline under another's trademark or brand name, plaintiffs assert that the holder of the trademark may do no more than license use of its trademark and brand name, specify its unique formula, if any, and police quality controls over the gasoline being sold under its brand name. This portion of plaintiffs' argument is founded upon the principles of Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L. Ed.2d 232 (1972). Plaintiffs contend that the agreements are per se illegal tying agreements as distinct from exclusive dealing requirements contracts under the doctrines of Warriner Hermetics, Inc. v. Copeland Refrigeration Corp., 463 F.2d 1002 (5th Cir.), cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).

Plaintiffs claim that the trademark protection clauses, constituting per se antitrust violations, and the "interdependent consciously parallel action" of all defendants warrant class certification. Defendants counter with the assertion that no lease or other agreement by its terms, express or implied, purports to prohibit plaintiffs or any proposed class member from selling another company's gasoline products on the leased premises so long as there is no trademark or brand name violation. Plaintiffs, while apparently conceding that there is no express contractual prohibition against sale of competing brands on the leased premises, point out the practical impossibility of so doing because of short-term leases, lease restrictions on improvements and alterations to the demised premises, inability of lessees to make substantial capital investments, zoning restrictions, and rental payments based on sales of lessor's gasoline. Plaintiffs finally assert that no lessee has ever successfully installed pumps and tanks of another oil company on a service station leased from one of the defendants, and sold thereon a gasoline brand name other than lessor's. Defendants counter with the argument that no lessee has ever sought or made any attempt to sell another oil company's gasoline from a leased property.

Defendants' primary objection to a class certification is that since there is no common lease clause that allegedly imposes a restriction against the sale of a competitor's gasoline products from another oil company's leased property, the question of an illegal tie-in depends upon whether there was individual coercion, a separate and distinct question as to each lessee. Defendants further point out that there are more than 400 different forms of leases and oil sales agreements utilized by the defendants all of which would require individual interpretation not only as to each form but also as to each individually executed lease and agreement because most, if not all, contain specialized terms and conditions.

6. In support, plaintiffs cite: Allvine and Patterson, Competition Ltd., The Marketing of Gasoline, with excerpts from a 1965 hearing before the Federal Trade Commission to establish that gasoline is fungible; an affidavit by J. C. Sealey, of Shell Oil Co., stating that 10% of the gasoline sold under the Shell brand name is manufactured by other oil companies but meets Shell's specifications; and the Preliminary Federal Trade Commission Staff Report on its Investigation of the Petroleum Industry to establish that oil companies frequently exchange crude oil and gasoline. Also Sinclair Refining Co. v. Schwartz, 398 Pa. 60 (1959), where the Pennsylvania Supreme Court stated at 64, 157 A.2d 63 at 65:

. . . it occurs to us that one company's gasoline may not differ in content or quality from that of another merely because they differ in color or advertising slogans, at least in the regular gasolines, which seem to be uniform in price.

Plaintiffs contend that class action treatment is appropriate under Fed.R. Civ.P. 23.[7] Plaintiffs assert that the four prerequisites of 23(a) have been fulfilled, and that class action certification would be appropriate under either 23(b)(1), 23(b)(2) or 23(b)(3). Not unexpectedly, defendants contend that plaintiffs meet none of the requirements for class action certification except the 23(a)(1) prerequisite that the class is so numerous that "joinder of all members is impracticable". Conceding the great number of potential class members, defendants take the position that the class is in reality so large that notice requirements and divers individual issues would make insurmountable difficulties in the management of a class action.[8]

The appropriateness of class action certification is not dependent upon the merits of the case. *See* Miller v. Mackey International, Inc., 452 F.2d 424 (5th Cir. 1971). The merits of the issues are entirely separate and distinct from whether a class should be certified. Even a failure to state a cause of action is not necessarily fatal to a class action certification. Kahan v. Rosenstiel, 424 F.2d 161, 169 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), stated: [9]

. . . The determination whether there is a proper class does not depend on the existence of a cause of action. A suit may be a proper class action, conforming to Rule 23, and still be

7. (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of

the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

8. Although there has been extensive discovery, estimates of the size of the potential class is extremely vague. There are approximately 385,000 service stations in the United States, but how many are owned by major oil companies and leased to dealers is not certainly established in the record. Also, because the proposed class includes former operators and the turnover rate is high, the estimates have a wide range. Plaintiffs estimate the total class "could possibly be less than 100,000." Defendants indicate the size between 250,000 to 2,000,000. (See plaintiff's July 9, 1973 class action brief, p. 34).

9. However, in Kahan v. Rosenstiel the Circuit Court concluded at 174: "it is our view that plaintiff's pleadings state a cause of action which may be the basis for an award of counsel fees . . . ."

dismissed for failure to state a cause of action.

While determination of the pending Rule 23 motion must be unaffected by the merits or possible final outcome of a trial on the merits, identification of the issues that will be presented at a trial would appear essential in analyzing the appropriateness of a class certification and in applying the Rule 23 standards. In Abercrombie v. Lum's, Inc., 345 F. Supp. 387, 390 (S.D.Fla.1972), the court stated:

> . . . an analysis of the issues and the nature of proof which will be required at trial is directly relevant to a determination of whether the matters in dispute are principally individual in nature or are susceptible of proof equally applicable to all class members.

█ Because plaintiffs' claims are based on alleged illegal tying agreements practiced by all defendants upon their respective lessees, the requisite elements of an illegal tie-in agreement should be noted. There are three basic requisites.

1. There must be two separate products, one the tying product which cannot be obtained without purchase of the tied product. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The alleged tying product in this case is the valuable leasehold site and the tied product is the lessor's trademarked brand name gasoline.[10]

2. The tying product must have sufficient economic power or advantage to appreciably restrain competition in the market of the tied product. Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).[11]

3. The antitrust violation must affect a "not insubstantial" amount of commerce. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L. Ed. 20 (1947).

Plaintiffs contend that class action certification would be appropriate under any of the three subsections of Rule 23(b). Before analyzing the possibility of certification under each of these subsections, recognition must be given that one of the basic claims for relief, if not the sole actual claim, is monetary damages, even though the complaints also demand that "defendants be permanently enjoined from continuing the unlawful activities alleged" and "such other and further relief as may appear necessary and appropriate."

Rule 23(b)(1)(A) was created to prevent separate adjudications which "would establish incompatible standards of conduct for the party opposing the class." Both the wording and logic of the rule indicate that it is to protect defendants. The Advisory Committee's Notes on the 1966 Amendments to the Rule state, in part:

> The felt necessity for a class action is greatest when the courts are called upon to order or sanction the alteration of the status quo in circumstances such that a large number of persons are in a position to call on a single person to alter the status quo, or to complain if it is altered, and the possibility exists that [the] actor might be called upon to act in inconsistent ways.

Quoting from Louisell & Hazard, Pleading and Procedure: State & Federal 719 (1962).

██ As I interpret 23(b)(1)(A), it is primarily to prevent a defendant from being caught in a classic "Catch 22" situation where one court orders a defendant to take certain action which another

---

10. It is curious to note that most antitrust "tying agreement" cases involving trademark or brand name products have alleged that the brand name product is the tying product which is tied to the required purchase of unnecessary or undesirable products. *Cf.* Warriner Hermetics, Inc. v. Copeland Refrigeration Corp., *supra.*

11. *Northern Pacific* involved valuable leaseholds as the tying product, and is direct precedent that a unique leasehold may constitute the tie.

court orders the same defendant not to take. I do not understand that solely because one court might determine that a defendant is liable in damages to a particular oil lessee-dealer for an antitrust violation, while another court on an analogous factual situation might determine no liability in damages to some other oil lessee-dealer, class action treatment under 23(b)(1)(A) would be appropriate. The rule requires not only "inconsistent and varying adjudication," but such adjudications must establish "incompatible standards of conduct."

In Goldman v. First National Bank of Chicago, 56 F.R.D. 587 (N.D.Ill.1972), it was stated at 590:

> [I]n order for there to be a risk of varying adjudications, there must be different parties attempting to impose different standards upon an individual.

Plaintiffs seek to impose certain standards of conduct on defendants which defendants resist, but it does not appear that anyone is seeking to impose inconsistent or incompatible or even different or varying standards upon defendants.

It has been held that because Rule 23(b)(1)(A) is to protect defendants against the risk of being forced to conform to incompatible standards of conduct, if defendants are willing to accept such risk, whether real or illusory, certification may be denied. Alsup v. Montgomery Ward & Co., 57 F.R.D. 89 (N.D.Cal.1972); Kenney v. Landis Financial Group, Inc., 349 F.Supp. 939 (N. D.Iowa 1972). In addition, Rule 23(b) (1)(A) does not appear to have been intended to authorize certification where a primary objective is monetary damages. Rodriguez v. Family Publications Service, Inc., 57 F.R.D. 189 (C.D.Cal. 1972).

Rule 23(b)(1)(B) seeks to protect potential claimants where adjudications as to other claimants would be dispositive of the interests of other members of the potential class. A determination of issues as to one service station lessee would not be dispositive, legally or "as a practical matter" of similar claims by any other service station lessee. The precedential effect of such a judgment disposes of no other claim. The principles of *stare decisis* do not create authorization for a Rule 23(b)(1)(B) certification. Alsup v. Montgomery Ward & Co., *supra*; Goldman v. First National Bank of Chicago, *supra*; Rodriguez v. Family Publications Service, Inc., *supra*. The mere fact that one claimant might be successful and another unsuccessful creates no basis for a Rule 23(b)(1)(B) certification. Rodriguez v. Family Publications Service, Inc., *supra* at 192–193, states:

> . . . the Advisory Committee's Note to clause (B), demonstrates that the clause was intended to apply to situations, not present here, where the members of the class each have rights in a common organization, fund or contract which ought to be adjudicated together in order to avoid unfair legal or practical advantage by one over another member of the class.

Certification under Rule 23(b)(1) is therefore inappropriate.

Rule 23(b)(2) is applicable by its express terms only where final declaratory or injunctive relief with respect to the entire class is appropriate. Plaintiffs contend that the trademark protection clauses incorporated in the leases constitute per se illegal tying agreements, and therefore defendants are clearly subject to injunctive relief. Tying arrangements have been held to constitute per se violations of the Sherman Act and proof that they "unreasonably" restrain competition is not required. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); Northern Pacific Ry. v. United States, *supra*; International Salt Co. v. United States, *supra*. In the present case, however, unlike Siegel v. Chicken Delight, Inc., 271

F.Supp. 722 (N.D.Cal.1967), as modified by Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969), there is no express or implied provision in the leases or other agreements between defendants and potential class members that imposes any requirement that the lessee purchase only from lessor or that lessee not sell any but lessor's gasoline. Plaintiff's contention that, as a practical matter, lessees are prohibited from so doing, of necessity seems to require individual considerations.[12] Applicable to a Rule 23(b)(2) certification, it becomes apparent that individual questions would make final declaratory or injunctive relief as to the entire class inappropriate. Obviously, the possibility that plaintiffs' theory of class wide entitlement to injunctive relief may not be sustained upon final determination of the litigation does not preclude a class certification. Nevertheless, it would seem appropriate to hesitate before issuing a class certification that might require thousands of individual factual variations to be determined. Will certification probably result in judicial economy, and serve the basic purposes and advantages of class certification?

Rule 23(b)(2) has been a useful tool primarily in civil rights cases, where class actions are often favorably considered. Hairston v. Hutzler, 334 F.Supp. 251 (W.D.Pa.1971), aff'd, 468 F.2d 621 (3d Cir. 1972); Glus v. G. C. Murphy Co., 329 F.Supp. 563 (W.D.Pa.1971). As the Advisory Committee Notes indicate, however, Rule 23(b)(2) is not limited to civil rights actions. It has been utilized in several patent cases. See Dale Electronics, Inc. v. R. C. L. Electronics, Inc., 53 F.R.D. 531 (D.N.H.1971); Research Corp. v. Pfister Associated Growers, Inc., 301 F.Supp. 497 (N.D.Ill.1969); Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc., 285 F.Supp. 714 (N.D. Ill.1968).

The Notes of the Advisory Committee as to the 1966 amendments state flatly:

"[This] subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." No guidelines are suggested in the Rule or Advisory Notes for determining whether monetary damages are the predominant final relief sought. Where as here, it appears clear that monetary damages are, at the very least, a very substantial essential element of plaintiffs' claim, certification under 23(b)(2) would seem inappropriate. As to those former service station lessees who would not be interested in going back into the service station business under any conditions, the only possible final relief favorable to them would be monetary damages.

■ There seems to be little doubt that monetary damages may be awarded as relief ancillary to an injunctive decree in a class action under appropriate circumstances. See Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) (a racial discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.); Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (7th Cir. 1969) (a Title VII sex discrimination action). That is entirely different from holding that because injunctive relief on behalf of a class is sought, a class action certification under Rule 23(b)(2) is appropriate even though one of the principal purposes is to obtain monetary damages.

■ There is another reason in this case that makes inappropriate the treatment of the claim for monetary damages as merely ancillary to the request for injunctive relief. Plaintiffs' complaints expressly assert jurisdiction under Section 4 and Section 16 of the Clayton Act. Section 4 (15 U.S.C. § 15) expressly and exclusively provides for a private action for treble damages. No other relief is specified under Section 4. The only appropriate relief under this statute would

---

12. See discussion beginning at page 136, infra, as to individual considerations.

appear to relate exclusively and solely to monetary damages. Section 16 (15 U.S. C. § 26) provides exclusively for injunctive relief. It has been held that an award of damages under Section 16 is improper. Decorative Stone Co. v. Building Trades Council of Westchester County, 23 F.2d 426 (2d Cir.), cert. denied, 277 U.S. 594, 48 S.Ct. 530, 72 L.Ed. 1005 (1928), citing Fleitmann Co. v. Welsbach Street Lighting Co., 240 U.S. 27, 36 S.Ct. 233, 60 L.Ed. 505 (1916). Consequently, it is unnecessary to decide whether the claim for monetary damages or the claim for injunctive relief is primary and the other ancillary, or whether, as suggested in defendants' brief (Supplemental Memorandum, p. 28), allowance of monetary damages under a 23(b)(2) certification would constitute a case of the "tail wagging the dog." To the extent that plaintiffs seek treble damages under Section 4 of the Clayton Act, certification of a class under Rule 23(b)(2) would appear to be entirely inappropriate. Section 4 damages can hardly be said to be ancillary to Section 16 injunctive relief under the statutory scheme of the Act. I, therefore, conclude that certification under Rule 23(b)(2) would be improper so long as plaintiffs seek monetary damages under Section 4 of the Clayton Act.[13]

The final and most difficult determination is whether class action should be certified under Rule 23(b)(3). The primary requisites for a (b)(3) certification are that common questions of law or fact predominate and that class action is the superior method for a fair and efficient adjudication of the controversy. Specific criteria for making express findings are set forth in the Rule. In determining whether a 23(b)(3) class should be certified, a pragmatic approach must be adopted. The 1966 Advisory Committee Notes to Rule 23 state in part:

> Subdivision (b)(3). In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above, [Subdivisions (b)(1) and (b)(2)] but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

Some indication of the types of actions suitable for Rule 23(b)(3) certification are set forth in the 1966 Advisory Committee Notes as follows:

> . . . It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite

13. Even if a class action could be certified under Rule 23(b)(2), it seems to me that Rule 23(b)(3) notice would be essential in order to have binding effect on class members as to any monetary award of damages. I fail to see how a class member's right to obtain damages that are expressly provided for by statute, could be finally litigated and determined, in the absence of compliance with the notice requirements of Rule 23(b)(3) with the right to "opt out". It further would appear that the major practical difference between a 23(b)(2) and a 23(b)(3) certification is the more explicit requirements for a 23(b)(3) certification and the stricter notice requirements of 23(b)(3).

Regardless of the extent of constitutional "due process" requirements in giving actual notice to class members, at least insofar as monetary damages are concerned, fairness and justice would seem to mandate actual notice in order to impose binding effect of any judgment. Until and unless controlling authority dictates to the contrary, the rules prescribed in Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973), for notice to class members, would appear to be requisite in the type of case presently before me. Consequently, the only possible proper class certification would be under Rule 23(b)(3).

the need, if liability is found, for separate determination of damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed. [citations omitted] . . . A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. [citations omitted] Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions.

Plaintiffs claim that there is but a single issue and that "every question of fact or law germane to this issue is common to every member of the class." (Plaintiff's supplemental class action memorandum, page 12). They further contend "that the single, solitary issue in this case will be whether contractual provisions in the agreements, promulgated by the defendants, which all members of the class signed, violate the antitrust laws and therefore common issues of fact and law will undeniably predominate." (Plaintiff's supplemental class action memorandum, page 15). In the complaints, paragraph 5 alleges that "through the contracts and leases, the plaintiff was required to sell only gasoline bought from his defendant lessor." Paragraph 12 alleges that "the defend-

ants' leasing of service station sites . . . is conditioned upon the signing of contracts of sale or other contractual provisions for the exclusive purchase and sale of the lessor's brand of gasoline." These allegations are denied by defendants. Defendants concede only that all contracts contain a trademark protection clause.

Cases have permitted class actions where there is a common course of conduct, which is said to "predominate" notwithstanding separate contractual terms. Lamar v. H & B Novelty Loan Co., 55 F.R.D. 22 (D.Or.1972); Contract Buyers League v. F&F Investment, 48 F.R.D. 7 (N.D.Ill.1969); See Alameda Oil Co. v. Ideal Basic Industries, Inc., 326 F.Supp. 98 (D.Colo.1971).

A substantial number of cases have held that a class action may be certified if the issues involving liability have predominating common issues of fact or law, even though damages may have to be individually determined and tried by a jury.[14] Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); Mersay v. First Republic Corp. of America, 43 F.R.D. 465 (S.D.N.Y. 1968); Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968).

However, class actions were held inappropriate where proof of the relevant issues would require examination of individual and disparate franchise agreements (although containing a common provision upon which plaintiffs relied in part as proof of an illegal tie-in) and determination of individual coercion. Abercrombie v. Lum's, Inc., *supra.* See Di Constanzo v. Chrysler Corporation, 57 F.R.D. 495 (E.D.Pa.1972); In re 7-Eleven Franchise Antitrust Litigation, 1972 Trade Reg.Rep. §§ 74, 156 (W.D. Cal.1972).

14. The Third Circuit's recent opinion in Katz v. Carte Blanche Corp., Slip Op. No. 72–1054 (3d Cir., filed May 22, 1973), holding that class action certification for issues of liability may be made, even where there may be individual issues as to whether one is a member of the class, was vacated on June 20, 1973, and a rehearing *en banc* held on November 15, 1973.

Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970), refused a class action on behalf of 140 service station dealers in Southwest Ohio where the alleged illegal tie-in concerned trading stamps and games not expressly required under the lease-contracts. Although there were substantial counterclaims asserted which had some bearing on the decision,[15] class action was refused because the issue of coercive tie-in agreements required individual determinations. Similarly, class action has been denied where proof would require examination of individual business relationships. Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y. 1968); School District of Phila. v. Harper & Row, Publishers, Inc., 267 F.Supp. 1001 (E.D.Pa.1967).

Plaintiffs contend that the contracts require "the exclusive purchase and sale of lessor's brand of gasoline" and that such constitutes an illegal tie-in of the lease with the sale of brand name gasoline. It is contended that all of the defendant oil companies engage in similar practices, and that all leases require that no gasoline other than that supplied by lessors may be sold from the tanks and pumps of lessors or under the lessors' brand name. These issues, plaintiffs assert, are appropriate for class action determination even though damages may be an individual matter.

If the sole question was whether such trademark protection clauses, however worded, constituted in and of themselves violation of the antitrust laws, a class action for determining the legality of such a clause might be appropriate. Thus, in the well known and often cited cases of Siegel v. Chicken Delight, Inc.,

271 F.Supp. 722 (N.D.Cal.1967), as modified by Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969), there existed a standard contract clause in all of the franchising agreements which plaintiffs contended imposed an illegal tying agreement.

Is there a common lease clause prohibiting lessees from purchasing gasoline from any oil company other than their lessors? Plaintiffs rely upon the alleged admissions by defendants concerning their trademark protection clauses as evidence of this standard contract provision. Plaintiffs' reliance on defendants' admission as proof of their class action claim is misplaced. Defendants have only admitted that they uniformly employ trademark protection clauses to prevent a lessee from selling gasoline of another oil company under the lessor's brand name. Defendants have nowhere admitted that their leases contain any clause *requiring* lessees to purchase *only* the gasoline of their respective lessors. No common lease clause directly or indirectly supporting plaintiffs' allegations has been found nor have plaintiffs been able to indicate that such a clause exists. The leases do not require the sale of only the lessor's gasoline on the lease premises nor do I see how they could be so interpreted.

It is clear from briefs, depositions and arguments that plaintiffs seek to contend that *the practical economic effect of the contracts*,[16] as opposed to an interpretation of the wording of the contracts, is that no lessee is able to sell another brand of gasoline from his leased service station.[17] This, almost

---

15. Defendants, in this case, assert that they would file substantial individual counterclaims as to many individual service station dealers, both past and present. Although this might be critical at a damage phase of the trial, I do not consider it particularly significant in reaching a determination on the present motion for class action certification.

16. See p. 7 of plaintiffs' motion for determination as to maintenance of class action.

17. Opposing counsel have engaged in a correspondence war over F.T.C. v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 (1923). Defendants' counsel strongly contend that the case is dispositive of the present controversy while plaintiffs' counsel tenaciously argue that it is clearly distin-

by definition, requires an examination into the particular situation of each and every present lessee as well as former lessees, if the class is to be maintained on their behalf. Complicating the issue is the fact that there are over 400 various contractual forms utilized among the 15 defendant oil corporations. The case is not one of interpreting the legal effect of one standard form of contract, or even of the 400 different forms of contracts and agreements. A determination of this case, on the theory upon which it has been set forth by plaintiffs would require a factual determination in each and every lease that there was such economic coercion in fact as to constitute an illegal tie-in agreement. The question of whether there are illegal tie-ins therefore of necessity requires proof of exertion of economic coercive force as to each individual dealer. Thus, the issue of liability, as well as damages, may vary from dealer to dealer and thereby make a class action determination meaningless.

Strategic land sites can be utilized as the tying products for illegal tie-in agreements. Northern Pacific Ry. v. United States, *supra*. The lease of a strategically located service station could likewise have sufficient economic power under certain circumstances. Unless, however, it could be determined that all oil company-leased service stations throughout the nation at all locations were so strategically located as to be able to coerce illegal tie-in agreements, class action determination would be impossible.[18] It is conceded that there are numerous independent dealers selling both trademark and unlabeled gasoline that very successfully compete with company-owned and leased service stations. Consequently, in each case, or at least in varying geographical areas throughout the nation, individual determinations would have to be made as to whether the strategic location of the industry owned stations had sufficient economic force in the market to act as an illegal "tying" product.[19]

Some cases recognize that a predominating question may be the existence of a conspiracy, and thus appropriate for class action treatment. Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); Morris v. Burchard, 51 F.R.D. 530 (S.D.N.Y.1971); State of Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D.Minn.1968). Plaintiffs seek to assert the allegation of "a course of interdependent consciously parallel action" as tantamount to an allegation of a conspiracy, citing Wall Products Co. v. National Gypsum Co., 326 F.Supp. 295 (N.D.Cal.1971) and Moore v. Matthews, 473 F.2d 328 (9th Cir. 1972).

It is well established that "conscious parallelism" in and of itself, is insufficient to support a conspiratorial allegation. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273

---

guishable from the facts of the instant action. The Supreme Court held in *Sinclair* that it was not an antitrust violation for defendant oil companies to lease pumps and underground tanks to dealer-owners upon the condition that the equipment be used only to store gasoline supplied by the lessor. The case is instructive in that the Court rejected a "practical effects" argument similar to that presented by plaintiffs in the instant action.

18. Plaintiffs' original complaint did contend as one of its major theories that the defendant oil companies had strangled free competition in obtaining service station sites by buying or otherwise controlling all of the strategic sites in the nation. This theory was abandoned in the amended complaint.

19. As to some service stations, the right to sell a particular defendant's brand name gasoline might be far more valuable than acquiring the particular site; for example, at the same intersection where there are two or more service stations available on equal terms and having equal physical attributes, and in an area where one oil company has a more extensive brand name advertising campaign. In such a situation a tie-in might in fact exist, exactly converse to that claimed by plaintiffs to exist everywhere throughout the nation.

(1954); Klein v. American Luggage Works, Inc., 323 F.2d 787 (3d Cir. 1963); Fiumara v. Texaco, Inc., 204 F.Supp. 544 (E.D.Pa.1962); *See* Delaware Valley Marine Supply Co. v. American Tobacco Co., 297 F.2d 199 (3d Cir. 1971). The cases cited by plaintiff hold no more than that "interdependent conscious parallel action" in connection with surrounding circumstances, would be evidence of a conspiracy. In *Wall Products Co., supra,* Judge Zirpoli made a finding of fact that there was a conspiracy that involved "more than mere 'conscious parallelism.'" In any event, even if the issue were more clearly in plaintiffs' favor, a class action should not be certified because the issue of a conspiracy, even if directly alleged, would not be predominant as required by 23(b)(3). This has been the result with other antitrust suits where individual issues were found to predominate even though conspiracies had been alleged. Cotchett v. Avis Rent A Car System, Inc., 56 F.R.D. 549 (S.D.N.Y.1972); School Dist. of Phila. v. Harper & Row, *supra.*

Plaintiff's argument that gasoline is fungible and therefore may not have the trademark protection claimed by defendants is unconvincing as to a class action certification. Even if a determination is made favorable to plaintiffs that all gasoline of a given octane rating is the same, this would not prove any illegal tie-in. At best, it would merely cut out one of defendants' asserted defenses. Actual prohibition of sales of other brands of gasoline from the service stations would have to be established. Since the contracts do not expressly prohibit such sales, the question of individual coercion would still have to be established as to every lessee.

There are many other problems that would arise if the case were certified as a class action. Plaintiffs' theory of damages is dubious at best. The contention is that if class members could purchase their gasoline requirements on a free and open market they could negotiate for a lower price per gallon, and thereby reap the benefit. Plaintiffs seem to contend that the measure of damages would be the reduced price per gallon at which the lessee dealers could buy the gasoline. Despite very difficult problems of proof of such potential reduced prices, hornbook law indicates that the measure of damages would be the loss of profit. The realities of the market place would not necessarily cause an increase in lessees' profit even if lessees could purchase their individual gasoline requirements at lower prices. This is particularly applicable if, as plaintiffs' counsel so convincingly argue, all gasoline of the same octane rating is the same irrespective of brand name or trade secret formulas. Indication of the way in which price of fungible goods fluctuate within very close confines in an open and competitive market is clearly exemplified in Wall Products Co. v. National Gypsum Co., *supra.*

In addition, plaintiffs completely ignore the requirements of the Robinson-Patman Act, 15 U.S.C. § 13 et seq., which would necessitate a defendant to sell at the same price to all persons in the competitive market area.[20] Thus, if dealer A obtained a price reduction, the same price reduction would have to be offered to dealer B. The net result is that although a general price reduction might occur, this would be of no apparent monetary value to the retail dealer who would have to sell in a competitive market. If one accepts plaintiffs' premise that a wholesale price reduction would occur, the persons harmed are not the dealers whose profit is in the "mark-up" between wholesale and retail price, but the consuming public.

Most class action certifications that have been permitted even though proof of damages may be a matter of individual proof appear to involve situations

---

20. By plaintiffs' seeking a nationwide class they must, it seems to me, logically contend that the competitive market area is likewise nationwide.

where establishing individual damages at least follows an easily ascertained standard pattern. The classic type of price-fixing case where it can be established that each unit sold was at an inflated fixed dollar amount per unit, and individual damages require only proof of the number of units purchased by each claimant, makes class action treatment appropriate. Where, however, individual damages require extensive individual proof of local and varying market conditions to prove loss of profit, the task becomes enormously more complicated.

■ Plaintiffs in oral argument have suggested that a class action is quite manageable. They suggest that notice could be by some general notice in trade publications as to former lessees. They have further suggested that if a class action is certified and it is determined judicially that the practices violate the antitrust laws, the individual claims would probably either be settled or could be referred to a master. Both of these possibilities appear to me to be improper considerations when deciding whether a class should be certified. To force settlement of honestly contested matters because of the economic realities of the costs of litigation is no more than a plain miscarriage of justice. That settlements occur every day in courts throughout the land because it is "cheaper to settle" cannot be denied. The judicial system lacks perfection. Certifying class actions, when everyone recognizes that the individual claims can never be fully litigated, with the constitutionally guaranteed right of trial by jury, because of the prohibitive costs of litigation, does not lend itself to "a fair and efficient adjudication of the controversy" and violates the purposes of Rule 23 class actions.

There would appear to be possible serious conflicts of interests between present and former lessees, and I do not believe that counsel could fairly represent both classes. Conceivably, former lessees might have to be afforded, as part of any relief granted them, the right to re-enter the service station business in direct competition with present lessees. Present lessees may well have interests in the continued financial strength of their lessors, even though they seek both injunctive and monetary damages by way of relief. Present lessees therefore would appear to have no common interest with former lessees obtaining monetary damages. I do not, however, consider these problems as critical in this case to a class action certification as it would be possible to allow only one class or certify subclasses. Nevertheless, a conflict between present and former franchisees was deemed an important reason for terminating a class certification theretofore tentatively certified by Chief Judge Lord in Seligson v. The Plum Tree, Inc., 61 F.R.D. 343 (E.D. Pa., filed Nov. 20, 1973).

The asserted class members are presently or formerly business men who have had complicated business dealings with one or more of the defendants. Most, if not all, have invested personal capital in their business dealings with the defendants. If, as plaintiffs contend, defendants have violated the antitrust laws, and if treble damages are to be computed as plaintiffs contend, each member of the proposed class may be entitled to substantial damages. The necessity for class action treatment because individuals could not as a practical matter prosecute their individual claims is not apparent. If, as plaintiffs seem to contend, the agreements and circumstances constitute per se violations, as a matter of law, proof of liability as to individual claimants is not complicated. By class action treatment, proof is far more complicated because it would involve all defendants, all plaintiffs, and all geographical areas of the nation. The advantages therefore of class action treatment are at best minimal. Conversely class action treatment appears to me to have substantial and insurmountable disadvantages. To force all present and

former lessees to either "opt-out"[21] or be bound by a class action decision that might very substantially affect their future business relationships with defendants does not impress me as being "superior to other available methods for the fair and efficient adjudication of the controversy." The right and probable interest of the members of the class in individually controlling the prosecution of their individual claims against such individual defendant or defendants against whom they wish to assert a claim in a forum of their choice,[22] likewise weighs against class action treatment. See Rule 23(b)(3)(A).

Thus as to Rule 23(b)(3) I fail to find that questions of law or fact common to members of the class predominate over any questions affecting only individual members, both as to liability and damages. Class action is not, in my opinion superior to other available methods for the fair and efficient adjudication of the controversy. The interests of members of the class in individually controlling the prosecution of separate actions would appear to be superior to class action treatment and control. Because of disparate factual considerations in various geographical areas of the nation, concentrating the litigation in this forum does not appear to be desirable or advantageous. Management of a class action such as requested by plaintiffs presents enormous difficulties in (a) notice to class members, (b) processing individual damage claims and possible counterclaims and defenses, and (c) determining liability nationwide, as to all defendants in favor of the entire class of plaintiffs.

My final conclusion is that a class action should not be certified on behalf of plaintiffs in this action. Although there may be certain common issues of fact and law, they are not such as to justify class action treatment under any of the provisions of Rule 23. Plaintiffs' motion must, therefore, be denied.

---

21. "Opt-out" would only be allowed under a 23(b)(3) certification.

22. It is probable that most if not all of the defendants could be validly served in any federal judicial district in the nation.