**SHELL OIL COMPANY, Plaintiff,**

v.

**Barry WENTWORTH, Defendant.**

Civ. No. 3–92–207 (WWE).

United States District Court,
D. Connecticut.

April 1, 1993.

Mark Kean Ostrowski, Paul D. Sanson, Shipman & Goodwin, Hartford, CT, for plaintiff.

Jeffrey M. Sachs, Gesmonde, Pietresimone, Sgrignari, Pinkus & Sachs, Hamden, CT, for defendant.

## MEMORANDUM OF DECISION

EGINTON, Senior District Judge.

This case arises under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq. Plaintiff Shell Oil Company seeks to terminate its gasoline franchise with defendant Barry Wentworth on the ground of misbranding. The court held three days of hearings on plaintiff's motion to vacate (# 5–1) and defendant's motion for preliminary injunction (# 8–1), which proceedings on consent also constituted a bench trial on the merits of the action. Both sides have filed post-hearing briefs. After careful review of all the evidence, the court finds the following facts pursuant to Fed.R.Civ.P. 52(a).

880

## I. FINDINGS OF FACT

1. Plaintiff Shell Oil Company ("Shell") is a foreign business corporation incorporated under the laws of the State of Delaware with its principal place of business in Houston, Texas.

2. Defendant Barry Wentworth is a resident of the State of Connecticut. He has engaged in the retail business of selling motor fuels for over ten years, either as an employee of a Shell motor fuel retailer or as an owner of a Shell motor fuel retail establishment.

3. The premises known as One Whalley Avenue, New Haven, Connecticut is owned by Shell for the purpose of leasing said premises to engage in the retail sale of motor fuels and other products.

4. Prior to 1989, Robert Pitts operated the Shell station on the Whalley Avenue premises. Pitts is Wentworth's father-in-law.

5. On or about October 19, 1988, Wentworth agreed to purchase from Pitts all of the assets utilized by Pitts in connection with the operation of a Shell motor fuel franchise located at the Whalley Avenue premises.

6. On or about August 1989, Shell consented to the sale of the motor fuel franchise from Pitts to Wentworth.

7. On or about August 3, 1989, Shell and Wentworth entered into a Dealer Agreement, effective January 1, 1990 through December 31, 1994, pursuant to which Wentworth operated his motor fuel franchise on the Whalley Avenue premises.

8. On or about August 3, 1989, Shell and Wentworth entered into a Motor Fuel Station Lease, effective January 1, 1990 through December 31, 1994, pursuant to which Wentworth leased the Whalley Avenue premises from Shell, and upon which he conducted his motor fuel franchise.

9. From March 9, 1990 to April 12, 1992, Wentworth purchased 138,692 gallons of non-Shell gasoline from F & N Corporation d/b/a Imps Oil and Gas.

10. Wentworth resold the non-Shell gasoline at the Whalley Avenue premises. In the course of that resale, he used underground storage tanks, associated product lines, and motor fuel dispensing equipment which had been provided by Shell.

11. Wentworth concealed his sale of non-Shell gasoline from Shell by taking delivery of the unbranded product in the middle of the night on at least one occasion.

12. Wentworth did not inform Shell that he was buying non-Shell gasoline when questioned by Shell about the decrease in fuel delivery volume.

13. During the period in which Wentworth dispensed non-Shell gasoline, defendant did not cover the Shell logo, did not cover the product names on the pumps, and did not put up signs saying "this is not Shell gasoline" on the pump where people take the hose and read the dials. There is some evidence that defendant posted small signs high on the pumps stating: "This may not be a Shell product,"[1] but these signs consisted of white letters on white background and were not readily noticeable.[2]

14. Shell does not provide standard guidelines for debranding but rather addresses the issue on a case by case basis. Defendant did not ask Shell for debranding guidance before selling non-Shell fuel.

15. Article 3.1 of the Dealer Agreement prohibits dealers from selling non-Shell products under Shell identifications. It provides that:

> Shell hereby grants to Dealer the right to use Shell's Identifications to identify and advertise for resale at Dealer's Station the Petroleum Products and other Shell branded products Dealer may purchase. *However, Dealer shall not sell, under Shell's Identifications, any products other than Shell products, or any mixture or adulteration of any of the Shell products with*

---

1. Testimony of Barry Wentworth, *May 18, 1992 transcript* at p. 22.

2. *See May 18, 1992 transcript* at p. 23 ("THE COURT [looking at photograph of pumps: Yes. You'll have to show me where the sign is that says, 'This may not be Shell gasoline.' I can't spot that.")

*each other or with any other product or material.* If Dealer ceases to sell the Petroleum Products or uses Shell's Identifications in a manner which deceives or causes a likelihood of confusion to the motoring public, or if this Agreement terminates for any reason, Dealer shall immediately and completely discontinue the use of Shell's Identifications ... (Emphasis added.)

*Exhibit 1.*

16. Wentworth violated Article 3.1 of the Dealer Agreement by selling non-Shell products under Shell identifications.

17. Article 5.1 of the Motor Fuel Station Lease provides in pertinent part that:

Except with the prior written consent of Shell, which may be withheld consistent with applicable law, Dealer may not use underground tanks, associated product lines or motor fuel dispensing equipment provided by Shell in the sale or dispensing of non-Shell motor fuel.

*Exhibit 2.*

18. Defendant violated Article 5.1 of the Motor Fuel Station Lease by failing to obtain prior approval and consent from Shell before selling non-Shell gasoline.

19. Article 18.1 of the Dealer Agreement provides for termination of the franchise and franchise relationship as follows:

Subject to any limitations imposed by law, Shell may, at its option, terminate this Agreement upon notice (or advance notice if and as required by law) to Dealer for any one or more of the following grounds: (a) failure by Dealer to comply with any provision of this Agreement, which provision is both reasonable and of material significance to the relationship hereunder; (b) failure by Dealer to exert good faith efforts to carry out the provisions of this Agreement; (c) occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this Agreement is reasonable, including events such as: *(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by Dealer;* (d) a determination is made by Shell in good faith and in the normal course of business to withdraw from marketing of

motor fuel through retail outlets in the relevant geographic market area in which Dealer's Station is located; and (e) any other ground for which termination is provided for in this Agreement or in any related agreements constituting a franchise between Shell and Dealer, or it otherwise allowed by the PMPA or other applicable law. (Emphasis added.)

*Exhibit 1.*

20. Wentworth violated Article 18.1 of the Lease by mislabeling the gasoline he was selling. On at least one occasion, he mixed grades of gasoline by putting regular unleaded gasoline in the mid-grade gasoline tank. This mixture of grades was not disclosed to customers.

21. Article 10.1 of the Motor Fuel Station Lease provides for termination of the Lease as follows:

Subject to any limitation imposed by law, Shell may, at its option, terminate this lease upon notice (or advance notice if and as required by law) to Lessee for any one or more of the following grounds: (a) failure of the lessee to comply with any provision of this lease, which provision is both reasonable and of material significance to the relationship hereunder; ... (c) occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this lease is reasonable, including events such as; *(9) willful adulteration, mislabelling or misbranding of motor fuels or other trademark violations by Lessee.* (Emphasis added.)

*Exhibit 2.*

22. Shell notified Wentworth by certified letter dated April 14, 1992, that his franchise was being terminated because he was misbranding gasoline, and directed him to vacate the premises by April 21, 1992.

23. Shell does not have a policy or custom of condoning sales of non-Shell gasoline sales by franchisees.

## II. CONCLUSIONS OF LAW

A. *Termination under the PMPA*

The court first addresses Shell's claims for termination under the Petroleum Marketing

Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806. Shell claims that termination of the franchise was in accordance with the PMPA.

In 1978, Congress established the PMPA in order to establish protection for franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises. S.Rep. No. 95–731, 95th Cong., 2d Sess. 15 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 874. Although Congress intended "to protect franchisees from heavy-handed practices by oil companies," *Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302, 1305 (D.Minn.1979), it also recognized "the legitimate needs of a franchisor to be able to terminate a franchise." S.Rep. No. 95–731, at 19, 1978 U.S.Code Cong. & Admin.News 877. *See Di Napoli v. Exxon Corp.*, 549 F.Supp. 449 (D.N.J.1982).

A franchise under the PMPA includes a contract between a refiner and a retailer which provides for the use of a trademark in connection with the sale of motor fuel. 15 U.S.C. § 2801(1)(A)(ii). A refiner is defined as one who refines crude oil into motor fuel. 15 U.S.C. § 2801(5). A retailer is defined as any person who purchases motor fuel for sale to the general public for ultimate consumption. 15 U.S.C. § 2801(7). Shell is clearly a refiner and Wentworth is clearly a retailer. Thus, the PMPA applies to the franchise relationship between Shell and Wentworth.

Section 2802(b)(2) of the PMPA sets forth grounds for termination of a franchise. It provides, in pertinent part, that:

> [f]or purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:
>
> (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship ... [and]
>
> (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable ...

Wentworth has admitted to selling non-Shell gasoline from F & N Corporation under Shell identifications. *Transcript*, May 18, 1992 at 10. Between March 9, 1990 and April 12, 1992, he purchased 138,692 gallons of non-Shell gasoline from F & N Corporation without Shell's consent and in violation of the Lease Agreement.

■ As to subsection (A), "failure to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship," the applicable provision in the Lease Agreement is Article 3.1, which prohibits the dealer from selling under Shell identifications, non-Shell products or mixtures or adulterations. The evidence shows that defendant unquestionably violated Article 3.1 of the Lease Agreement. He has admitted to purchasing 138,692 gallons of non-Shell gasoline between March 9, 1990 and April 12, 1992. He resold the non-Shell gasoline, using Shell's underground storage tanks, associated product lines, and motor fuel dispensing equipment. He did this while displaying Shell identifications. He did not have the approval or consent of Shell to sell non-Shell gasoline.

■ Having determined that defendant engaged in misbranding in violation of Article 3.1 of the franchise, the next question is whether that provision is "reasonable" and "of material significance to the franchise relationship." Defendant argues it is not. In the Second Circuit, the reasonableness of a franchisor's attempt to terminate the franchise under § 2802(b)(2)(A) must be determined on an objective basis. The allegedly violated provision must be "reasonable," meaning objectively reasonable, taking into consideration all relevant facts and circumstances. *Darling v. Mobil Corp.*, 864 F.2d 981, 989 (2nd Cir.1989). The Second Circuit has held that a misbranding provision of a franchise is reasonable and material within the meaning of 15 U.S.C. § 2802(b)(2)(A), and that "passing off" other gasoline as that of the oil company's gasoline is ground for termination of the franchise under the PMPA. *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 56–57 (2d Cir.1984). After reviewing all of the evidence, the court finds that the misbranding provision in the franchise

between Shell and Wentworth is objectively reasonable.

As to subsection (C), "occurrence of an event which is relevant to the franchise relationship and as a result of which termination ... is reasonable ...", the PMPA defines the phrase to include willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee, 15 U.S.C. § 2802(c)(10). Because misbranding of motor fuels is included on the list, and because the Second Circuit in *Wisser* specifically identified misbranding as an "event relevant to the franchise relationship" thus justifying immediate termination within the meaning of 15 U.S.C. §§ 2802(b)(2)(C), 2802(c)(10), and 2802(c)(11), it is clear that termination is justified under the PMPA. *See also Amoco Oil Co. v. D.Z. Enterprises, Inc.*, 607 F.Supp. 595 (E.D.N.Y.1985); and *H.R.H. Service Station, Inc. v. Exxon Co., U.S.A., Div. of Exxon Corp.*, 591 F.Supp. 25 (S.D.N.Y.1983).

Accordingly, the court finds that defendant's sales of non-Shell fuel under Shell identifications violated the franchise and constituted misbranding within the meaning of the PMPA, which is a valid ground for termination under the PMPA.

## B. *Notice of termination*

■ On April 12, 1992, Shell confirmed defendant's misbranding. By letter dated April 14, 1992, Shell notified defendant that it intended to terminate the lease and agreement and franchise relationship effective April 21, 1992. Defendant contends that Shell's notice of termination violated 15 U.S.C. § 2804 by not providing 90 days notice as required by the PMPA.

The PMPA, in § 2804(a)(2), normally requires 90 days notice prior to termination, but § 2804(b)(1) provides an exception under circumstances where it would be unreasonable to require the franchisor to give 90 days notice. When the exception applies, notice must instead be given on the earliest date on which furnishing of such notification is reasonably practicable. *Wisser*, 730 F.2d at 59.

The Dealer Agreement does not specify notice requirements as to termination, except to say that there shall be notice given.[3]

■ The court finds that Wentworth has not raised a serious question as to the reasonableness of the seven days notice of termination. Defendant was committing a serious violation of Shell's contract by engaging in passing off non-Shell gasoline under the Shell trademark. This conduct had been going on for nearly two years before Shell was able to confirm it. Shell was justified in taking steps to stop this practice and to disassociate Wentworth from Shell immediately. Had Shell waited 90 days or a shorter period before notice and the effective date of termination, there is no reason to believe that Wentworth would not have used the time to continue misbranding.

Under the circumstances, Shell's seven days notice of termination was reasonable. *See also Wisser*, 730 F.2d at 60.

## C. *Estoppel*

Defendant raises the defense of estoppel. He argues that Shell should be estopped from terminating the franchise and evicting him for selling non-Shell gasoline, because Shell's customary practice has been to tolerate such sales in the past and the defendant changed his position in reliance on such past practices and thereby incurred or will incur some injury.

■ Equitable estoppel is legally cognizable in PMPA cases. *Shell Oil Co. v. Czar*, 1988 WL 404539, 1988 U.S.Dist. LEXIS 18564 (D.Conn.1988); *see also Gilderhus v. Amoco Oil Co.*, 470 F.Supp. 1302 (D.Minn. 1979). Under Connecticut law, estoppel always requires proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts. *Shell Oil Co. v. Czar*, 1988 WL 404539, 1988

---

3. The Lease Agreement provides that "Shell may, at its option, terminate this Agreement upon notice (or advance notice if and as required by law) to Dealer for any one or more of the following grounds ..." *Exhibit 1* at 8.

U.S.Dist. LEXIS 18564 (D.Conn.1988), citing *West Hartford v. Rechel,* 190 Conn. 114, 121, 459 A.2d 1015 (1983).

■ Here, the evidence does not support defendant's estoppel claim. Shell did not "do or say something calculated or intended to induce" Wentworth into believing that Shell would not terminate the franchise once the misbranding was discovered. In the few instances testified to where Shell was informed about misbranding activities of franchisees and decided not to terminate, Shell had valid reasons for not terminating the franchises. These reasons include lack of proof of misbranding, inadvertant delivery of non-Shell fuel, and adequate deidentification by franchisee. Because the first prong of the equitable estoppel test is clearly not satisfied, the estoppel argument must fail.

### D. *Opportunity to cure*

■ Defendant claims that Shell should have provided him with an opportunity to cure his misbranding activities. This claim is without merit. A retailer is not required to be given an opportunity to cure when the franchise is terminated by the oil company because of misbranding. *Wisser Co. v. Mobil Oil Corp.,* 730 F.2d 54, 58 (2d Cir.1984).

### E. *CUTPA*

Both plaintiff and defendant invoke the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110b et seq. CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). In its complaint, Shell claims that each sale by defendant of commingled or adulterated gasoline under Shell identifications constituted an unfair trade practice in violation of CUTPA, and seeks punitive damages, costs, and attorneys fees because of defendant's willful and repeated violations of CUTPA.

In his answer, defendant claims that the 8,800 gallon minimum fuel delivery requirement and requirement that payment be made by wire transfer or certified check constitutes unconscionable and unfair trade practices under CUTPA. Defendant claims that he would not have had to buy less expensive fuel from a non-Shell supplier had Shell established less onerous payment terms and delivery requirements.

■ The first inquiry is whether the PMPA preempts CUTPA. Section 2806 of the PMPA addresses the relationship of PMPA to state laws, and essentially preempts all state laws governing termination of franchises except those with identical provisions. 15 U.S.C. § 2806(a). CUTPA does not specifically address fuel franchise terminations, but rather governs unfair trade practices generally. It appears that CUTPA is not preempted by the PMPA. *See L.C. Williams Oil Co., Inc. v. Exxon Corp.,* 627 F.Supp. 864 (M.D.N.C.1985) (PMPA did not preempt North Caroline unfair trade practices law provision dictating that obligations of good faith, diligence, reasonableness, and care may not be disclaimed by agreement, or common law duty of good faith dealing, as they related to termination for alleged misbranding of gasoline).

■ To determine whether conduct is unfair within the meaning of CUTPA, courts consider the following criteria:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers (competitors or other businessmen).

*Aurigemma v. ARCO Petroleum Products, Co.,* 734 F.Supp. 1025, 1028 (D.Conn.1990) (citing *Web Press Serv. Corp. v. New London Motors, Inc.,* 203 Conn. 342, 355, 525 A.2d 57 (1987)). All three criteria do not need to be satisfied. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *McLaughlin Ford, Inc. v. Ford Motor Co.,* 192 Conn. 558, 569 n. 15, 473 A.2d 1185 (1984). An act or practice is considered

deceptive under CUTPA if it has a tendency or capacity to deceive. In evaluating tendency or capacity, the court should look to the least rather than most sophisticated readers. *Bailey Employment System, Inc. v. Hahn*, 545 F.Supp. 62, 67 (D.Conn.1982). A CUTPA violation can be established by showing either an actual deceptive practice or one amounting to a violation of public policy. *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 254, 550 A.2d 1061 (1988).

Here, defendant's conduct in selling non-Shell gasoline as Shell gasoline without adequate debranding signage constitutes unfair trade practices within the meaning of CUTPA. At least two of the *Auriguemma* criteria are satisfied here. First, Wentworth's conduct was "within at least the penumbra of some common law, statutory or other established concept of unfairness" as to the first criterion. Moreover, it was, at minimum, unethical conduct pursuant to the second criterion. Accordingly, the court finds in favor of Shell on its CUTPA claim.

In contrast, the court finds defendant's CUTPA claim to be without merit. Neither the fuel delivery requirement nor the payment requirement constitutes unfair or even unreasonable conduct on the part of Shell within the meaning of CUTPA.

### F. *Connecticut Gasoline Dealers Act*

Defendant makes four claims pursuant to the Connecticut Gasoline Dealers Act, Conn.Gen.Stat. § 42–133(1). The PMPA preempts the Connecticut statute. *See Lyons v. Mobil Oil Corp.*, 884 F.2d 1546, 1549 (2d Cir.1989); *Darling v. Mobil Oil Corp.*, 864 F.2d 981 (2d Cir.1989). Accordingly, defendant's § 42–133(1) claims are dismissed.

### III. CONCLUSION

For the reasons stated above, the court finds in favor of plaintiff. The court concludes that sufficient grounds exist for termination of the franchise under the PMPA and that proper termination procedures were followed. Shell is entitled to terminate its franchise and lease agreement with defendant and to take possession of the premises at One Whalley Avenue, New Haven, Connecticut. Defendant is also liable for damages stemming from breach of these agreements. Further proceedings to determine the amount of damages will be scheduled by the court. The court further orders that defendant pay Shell amounts due for services rendered and credit card chargebacks and other costs as determined in the hearing to be held on damages. The premises shall revert back to Shell on April 9, 1993. Defendant is ordered to vacate the premises by April 9, 1993 at 12 noon.

Plaintiff's motion to vacate (# 5–1) is GRANTED, and defendant's motion for preliminary injunction (# 8–1) is DENIED.