**SHELL OIL COMPANY, a Delaware Corporation, Plaintiff,**

v.

**A.Z. SERVICES, INC., Antonio Zaldumbide, and Skipper's Choice, Inc., Defendants.**

**No. 96–6921–CIV.**

United States District Court,
S.D. Florida.

Feb. 13, 1997.

William F. Hamilton, Samuel A. Danon, Karl Brandes, Holland & Knight, Miami, FL, for Plaintiff.

Steven T. Utrecht, Boca Raton, FL, Brett Feinstein, Law Office of Douglas D. Stratton, Miami Beach, FL, for Defendants.

## MEMORANDUM OPINION

MORENO, District Judge.

Plaintiff Shell Oil Company owns a ground lease at 5 North Federal Highway in Deerfield Beach, Florida, upon which a service station is located. In 1995, Shell and Defendant A.Z. Services, Inc., entered into a five-year contractual relationship through two written agreements, entitled "Dealer Agreement" and "Motor Fuel Station Lease," which together established a petroleum franchise relationship within the definition of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq. ("PMPA"). *Id.* § 2801(1)(B); *Prestin v. Mobil Oil Corp.*, 741 F.2d 268, 272 (9th Cir.1984). Pursuant to the franchise agreement, AZ was entitled to operate and lease the service station and utilize Shell's trademarks, brand name, service marks and other Shell identifications in connection with the sale of motor fuel and other petroleum products. In 1996, without Shell's prior consent, AZ removed Shell's trademarks and identifications from the property, stopped selling Shell products, and began selling the products of Skipper's Choice, one of Shell's competitors. Shell immediately terminated the franchise agreement and filed this action under the PMPA seeking an injunction compelling AZ to terminate the petroleum marketing franchise and to vacate and surrender the automobile service station premises.

The Court referred the motion for a preliminary injunction to Chief Magistrate Judge William C. Turnoff, and after limited discovery and an extensive hearing, the Magistrate Judge issued his Report and Recommendation recommending that the Motion for Preliminary Injunction be GRANTED. In his Report and Recommendation, the Magistrate Judge noted that the franchise agreement is exclusively governed by the PMPA and that a franchisor seeking injunctive relief must meet the traditional requirements for a preliminary injunction. *Shell Oil v. Altina Assoc., Inc.*, 866 F.Supp. 536, 539–40 (M.D.Fla.1994) ("Despite PMPA's failure to specifically authorize equitable relief on behalf of franchisors, courts have consistently found that federal courts have jurisdiction to resolve disputes on behalf of the franchisor"). The traditional preliminary injunction standard is well-established:

1) a substantial likelihood of success on the merits;

2) a substantial threat of irreparable injury;

3) the moving party's own injury outweighs the injury to the non-moving party; and

4) the injunction would not disserve the public interest.

*Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1022 (11th Cir.1989).

Following a review of the evidence presented in the record, the Magistrate Judge concluded that Shell would likely succeed on the merits of its claim, Shell would suffer irreparable harm absent a preliminary injunction, the public interest would be served by the preliminary injunction, and the equitable balance tipped in favor of Shell. Defendant AZ's fourteen objections to the Magistrate Judge's Report and Recommendation are considered below.

1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 or 7 of this title to be illegal

## I. SUBSTANTIVE OBJECTIONS

AZ raises numerous substantive objections to the conclusions reached by the Magistrate Judge in his Report and Recommendation. Each of these objections are considered in turn.

■ **1. Tying the purchase of fuel to the lease:** Under the Sherman Act, 15 U.S.C. § 1, et seq., agreements are unenforceable if they impose illegal tying arrangements.[1] As the Magistrate Judge noted, "[a] tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agree that he will not purchase that produce from any other supplier." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). The essential elements of a tying claim under the Sherman Act are:

1) that there are two separate products, a "tying" product and a "tied" product;

2) that those products are in fact "tied" together—that is, the buyer was forced to buy the tied product to get the tying product;

3) that the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product;

4) involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product; and

5) the tying company has an economic interest in the tied product.

*Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, *rehearing denied*, 946 F.2d 906 (11th Cir.1991), *cert. denied*, 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992).

shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 1 (1976).

"A lease of real property ... can be a tying product under Sherman Act § 1." *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207 (9th Cir. 1983), *cert. denied*, 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985).

AZ contends that its franchise agreement with Shell is unenforceable because the agreement illegally ties the purchase of Shell fuel to the service station lease.[2] Concluding that the provisions of a class action settlement approved by another district court in a legally and factually similar case are identical to those that AZ here claims violate the Sherman Act, *see Bogosian v. Gulf Oil Corporation*, Nos. 71–1137 and 71–2543, Class Action Settlement Order No. 16 (E.D. Pa. April 17, 1985), the Magistrate Judge relied on the terms of that settlement and concluded that Shell did not illegally tie the purchase of fuel to the service station lease. The Magistrate Judge also concluded that AZ failed to show that it was effectively precluded from selling non-brand gasoline, stating that "[t]he lease involved here was not of such a short duration that such improvements [to the property, including the installation of AZ's own tanks and dispensers from which non-brand fuel could be sold] would have been economically unfeasible."

The Court agrees with AZ that the *Bogosian* settlement is not legally dispositive in this case. As a preliminary matter, the Court notes that since the settlement was not an adjudication under the antitrust laws, its provisions establish no precedential authority in this unrelated case. In addition, the *Bogosian* Plaintiffs received $37 million as part of the settlement package. That the district court judge approved the settlement only indicates that $37 million was fair compensation for any legal rights that the Plaintiffs may have relinquished.

■ Nonetheless, an illegal tie can only occur where the seller has market power over the tying product and uses that power to coerce the buyer to buy the tying product. *See, e.g., Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 12–13, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). An illegal tie occurs where the seller has sufficient market power "to force a purchaser to do something that he would not do in a competitive environment." *Id.* at 13–14. The relevant inquiry here is Shell's power in the tying product market, service station leases, and not the market share of gasoline. *See, e.g., Power Test Petroleum Distr., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 96 (2d Cir.1985).

The requisite market share of service station leases needed to establish an illegal tying arrangement was discussed in a series of decisions that arose out of a case from the Eastern District of Pennsylvania. *See Bogosian v. Gulf Oil Corp.*, 62 F.R.D. 124 (E.D.Pa.1973), *order vacated*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), *on remand*, 596 F.Supp. 62 (E.D.Pa.1984); *Bogosian v. Gulf Oil Corp.*, 393 F.Supp. 1046 (E.D.Pa.1975), *judgment vacated*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), *on remand*, 596 F.Supp. 62 (E.D.Pa.1984). In *Bogosian*, 393 F.Supp. at 1053, the district court denied one franchisor's motion for summary judgment against its franchisee, in which the franchisor argued that it had not illegally tied the purchase of its fuel to the service station lease. The Court found that

2. Article 5 of the Dealer Agreement provides:

If Dealer fails to exercise the rights granted hereunder by failing ... to maintain at Dealer's Station a representative amount of each grade of Shell branded motor fuel for resale to the public from dispensers bearing Shell's identifications for any period of seven consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time, Shell shall have grounds to terminate or not renew this Agreement and any related agreements constituting the franchise between Shell and Dealer on notice (or advance notice of and as required by law) to Dealer.

In addition, Article 5.1 of the Lease Agreement provides:

Except with the prior consent of Shell, which may be withheld consistent with applicable law, Lessee may not use underground tanks, associated product lines or motor fuel dispensing equipment provided by Shell in the sale or dispensing of non-Shell motor fuel.

there were "material facts in dispute which may establish the economic power necessary" to show that the economic power of the tying product (leases) enables it to restrain free competition in the market for the tied product (gasoline). *Id.* at 1052–55. However, although the district court styled its order as one granting summary judgment, the issue presented to the court was whether the franchisee "stated an individual claim against his lessor," *see id.* at 1053, and therefore the district court's order should be viewed as one denying a motion to dismiss for failure to state a claim. *See also Bogosian,* 561 F.2d at 444 (treating the other motions for summary judgment, which the district court granted, as motions for summary judgment).

The *Bogosian* Plaintiffs also sought certification as a class, alleging that every oil company in the United States had conspired to effectuate an illegal tying of fuel to service station leases. *Bogosian,* 62 F.R.D. 124. After the district court denied class certification, *see id.,* the Third Circuit vacated the order, stating that

> Plaintiffs could show, for example, that the defendants controlled a majority of existing service stations and that because zoning restrictions and high capital costs make development of new stations difficult, the defendants have sufficient market dominance over existing stations to impose a tie-in.

*Bogosian,* 561 F.2d at 454. The district court, on remand, found that defendants "at one time controlled in excess of eighty percent of the developed service stations in the country" and a large share of the wholesale gasoline market, and therefore there was sufficient support for the jury to conclude that the defendants had sufficient economic power to appreciably restrain free competition. *Bogosian,* 596 F.Supp. at 71.

■ Applying *Bogosian*'s *published* decisions to the facts presented in the instant case, the Court concludes that AZ will not likely be able to show that Shell tied the purchase of Shell fuel to the lease of the Deerfield Beach service station. Given the combined market position of all major United States oil companies, there was sufficient evidence to allow a jury to conclude that the *Bogosian* defendants possessed the requisite market power for service station leases. Here, however, Plaintiff's claim is against only one oil company, and AZ will not likely be able to show that Shell's market power over service station leases is similarly or sufficiently expansive. *See Mobil Oil Corp. v. Shah,* 671 F.Supp. 503, 506 (N.D.Ill.1987) (franchisee failed to prove the elements of an illegal tying where oil company owned less than three percent of all the service station properties located in Illinois). Even were the burden on Shell to prove that they did not have the requisite market power, the Court concludes that Shell would likely be able to make such a showing.

AZ also contests that it did not have the ability to sell non-Shell gasoline. The Court notes that, pursuant to the franchise agreement, AZ was entitled to sell non-Shell fuel if it obtained Shell's prior written consent, dispensed the fuel from its own equipment, and continued selling a representative amount of Shell fuel. *See* Article 5 of the Dealer Agreement and Article 5.1 of the Lease Agreement. AZ argues, however, that although it had the legal right to sell non-Shell gasoline, the prohibitive cost of installing new tanks and pumps was an economic barrier which prevented it from exercising this right.

The Third Circuit, in *Bogosian,* considered whether a provision permitting a franchisee to sell other brands of gasoline if it installed its own tanks and pumps was a realistic option. According to the Court:

> Whether such a course is realistic[] is a common question of fact which can be developed by expert testimony concerning the relative costs and benefits of making such installations.... [If the short term lease and the lease provision which permits termination of the lease when a stated quantity of gasoline is not purchased from the lessor has] the practical economic effect of precluding sale of other than the lessor's gasoline, [plaintiffs] will have

shown that the purchase of gasoline was tied in to the lease of the service station ... and the lease agreement itself conditions the sale of one product ([] a lease) upon purchase of another....

*Bogosian,* 561 F.2d at 452. *See also Wisser Co., Inc. v. Mobil Oil Corp.,* 730 F.2d 54, 61 (2d Cir.1984) (franchisee "would not be unduly burdened by having to rent or buy operating equipment of its own" rather than continue to use the franchisor's operating equipment); *Little Caesar Enterprises, Inc. v. Smith,* No. 93–CV–73354–DT, 93–CV–74041–DT, 1995 WL 235248 (E.D.Mich., Apr.19, 1995) (discussing *Bogosian* extensively and stating that "a plaintiff will need to resort to additional proofs extrinsic to the contract in order to prove that the seller forced the buyer to buy another product or service from the seller by removing the buyer's freedom to purchase the tied item from a competing source"); *Bogosian v. Gulf Oil Corporation,* No. 71–1137, 712453, 1987 WL 4746 *3 (E.D.Pa. Jan. 15, 1987) (reviewing settlement terms and concluding that whether some franchisees will find it commercially advantageous to install separate tanks and pumps is unclear) (noting that the service station at issue had the physical capacity for additional tanks).

Before considering the evidence presented in the record on this issue, the Court must determine which party has the burden of proving (or disproving) whether AZ had the ability to sell non-Shell gasoline. Because Shell requested the equitable injunction, Shell must prove that it has a substantial likelihood of succeeding on the merits. Consequently, Shell must show, by offering evidence in support of its motion, that the Court will likely conclude that Shell validly terminated the franchise relationship. Whether Shell will succeed on this issue depends on whether AZ has presented a valid defense to what otherwise would be a clear violation of a valid franchise agreement. In other words, Shell must show that there is a substantial likelihood that AZ will not be able to prove that the parties' franchise agreement establishes an illegal tying arrangement in viola-

tion of the Sherman Act. To prevail on this issue at the preliminary injunction stage, AZ must set forth specific facts, more than "scant controverting evidence," establishing a genuine issue of fact. *Shah,* 671 F.Supp. at 505.

The primary evidence offered on this issue is the testimony of Robert Gardner, Shell's district manager for the southeast Florida area. Mr. Gardner testified that a "tank could be installed at this service station ... it's very feasible and very permitable." Transcript of Hearing on Motion for Preliminary Injunction before the Honorable William C. Turnoff, United States Magistrate Judge at 20 (October 8, 1996). In addition, when asked "whether in fact another set of tanks [could] be installed on the premises occupied by A.Z. Services safely," Gardner responded "I don't see why not ... I'm doing that at many stations right now with diesel tanks ...." *Id.* at 49. Finally, Gardner testified not only that it would cost $130,000.00 to install one of these tanks, but also that he was not specifically aware of any Shell dealer in the entire United States that had sold or was selling non-Shell fuel. Deposition of Robert Gardner at 66, 96 (September 30, 1996).

The Court notes that AZ has introduced no proof indicating that it was physically impossible for AZ to install tanks on the Deerfield Beach property, and has not introduced any economic analysis, other than Gardner's blanket statement regarding the cost of installing tanks and pumps, that this alternative was economically infeasible. The Magistrate Judge, in granting the parties over *six weeks* to conduct discovery prior to the preliminary injunction hearing, specifically encouraged the parties to present expert witnesses at the hearing. *See* Transcript of Emergency Motion Hearing Before the Honorable William C. Turnoff, United States Magistrate Judge at 16 (August 22, 1996). The Court concludes that *even if* no Shell station in the entire Unites States sells non-Shell gasoline, AZ must still offer more than this scant controverting evidence to establish a genuine issue of fact that it did not have

the ability to sell non-Shell gasoline. *See Little Caesar Enterprises,* 1995 WL 235248 at *33 (*"Bogosian's* proof of the practical economic effects would require [] extrinsic proofs, *probably by an economic expert,* as to the practical market effects and limitations a gas station operator faced in light of the various contract terms") (emphasis added).

■ **2. The remaining tying claims:** AZ contends that Shell illegally tied the use of Shell's trademark (the tying product) to the purchase of Shell gasoline (the tied product). In order to establish that the tie as an unlawful arrangement, AZ must demonstrate that the scheme involved two distinct products. *See, e.g., Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Although AZ's claim that the Shell trademark and Shell fuel are separate products is appealing, the Court is persuaded by the abundance of authority reaching an opposite conclusion and rejecting these trademark-tying claims. *See Power Test,* 754 F.2d at 96–97 ("the gasoline and the [trademark] are inseparable, inextricably interrelated, and not separate entities"); *Hamro v. Shell Oil Co.,* 674 F.2d 784, 787 (9th Cir.1982) ("as a matter of law the Shell trademark and Shell gasoline are not separate and distinct products"); *Redd v. Shell Oil Co.,* 524 F.2d 1054, 1057 (10th Cir. 1975) (Shell trademark and Shell gasoline are not separate products), *cert. denied,* 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976).

■ The Court also concludes that Shell has not tied Shell fuel to the franchise package. The Court adopts the conclusion reached in *Smith v. Mobil Oil Corp.,* 667 F.Supp. 1314, 1328 (W.D.Mo.1987), which rejected an argument identical to that presented by AZ. Finally, the Court agrees with the Magistrate Judge that Shell, by including a special additive in its fuel, does not sell a fungible commodity. *See, e.g., Power Test,* 754 F.2d at 98 ("Power Test gasoline is simply not fungible with any and all other gasolines"); *Freeman v. United Cities Propane Gas of Georgia, Inc.,* 807 F.Supp. 1533, 1540 (M.D.Ga.1992) (gasoline is not a fungible

good because "various companies place additives in the product in an attempt to distinguish their brand from other very similar brands"). Because Shell gasoline is not a fungible commodity (and because Shall lacks market power, *see supra* ), the Court concludes that Shell has not illegally tied the Shell trademark to the Deerfield Beach service station lease.

**3. Justification for terminating the franchise agreement:** The Magistrate Judge concluded that Shell was justified in terminating the franchise agreement. AZ argues that Shell cannot, pursuant to 15 U.S.C. 2802, demonstrate that AZ has violated a provision of the franchise which is both "reasonable and of material significance" to the franchise relationship from the standpoint of a neutral observer. *Doebereiner v. Sohio Oil Co.,* 893 F.2d 1275, 1277 (11th Cir.1990). Under *Doebereiner,* the violated provision must be "fair, proper, just or moderate—and of real importance or great consequence to the franchise relationship." *Id.* at 1276.

According to AZ, Shell has previously admitted that obtaining consent before debranding is not important to the franchise relationship, and therefore AZ's failure to request consent before debranding is merely an unimportant technical requirement that may not serve as the basis for termination. *See* 15 U.S.C. § 2801(13). AZ also argues that Shell must demonstrate, pursuant to § 2802(b)(2)(A), that the termination was *based upon* the breach of the franchise term that was both reasonable and materially significant. *See Reyes v. Atlantic Richfield Company,* 12 F.3d 1464, 1469 (9th Cir.1993). According to AZ, this demonstration cannot be made because Shell terminated the franchise relationship because of AZ's failure to purchase Shell gasoline, not because AZ used Shell tanks and pumps without Shell's prior consent.

■ Accepting Shell's claim that it terminated the agreement because AZ failed to buy *any* Shell gas and failed to timely request permission to sell non-Shell fuel from

the Deerfield Beach site, the Court concludes that Shell was justified in terminating the franchise relationship. AZ's failure to obtain permission was not a technical violation, and even if it were, other courts have concluded that requiring a franchisee to sell a franchisor's product is reasonable and significant to the franchise agreement. *Smoot v. Mobil Oil Corp.*, 722 F.Supp. 849, 855 (D.Mass. 1989) (finding that a provision of the franchise agreement requiring the franchisee to sell the franchisor's gasoline was fundamental to the franchise relationship); *Shah*, 671 F.Supp. at 507.

■ **4. Irreparable harm from loss of brand loyal customers:** Shell argues that it will suffer irreparable harm absent the preliminary injunction. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441 (11th Cir.1991) (citation omitted) (affirming the district court's conclusion that investments in goodwill and the loss of long-time customers is "difficult, if not impossible, to determine monetarily"); *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir., Unit A, 1981) (the loss of customers and goodwill is an "irreparable" injury).

According to AZ, Shell has not offered sufficient evidence that it suffers irreparable harm from the loss of brand loyal customers (primary customers of the Deerfield Beach site who would also buy gas at other Shell locations), since Shell only offered the testimony of one expert, Professor Sorenson, and not the testimony of any individual brand loyal customer. Furthermore, AZ points out that according to Shell's own expert witness, Shell's South Florida sales volume rose following the debranding. *See* Transcript of October 8, 1996 Preliminary Injunction Hearing at 57 (testimony of Robert Gardner). In any event, AZ contends that any loss of sales is quantifiable as actual damages, and therefore Shell has not suffered irreparable harm.

■ The Court, however, agrees with Shell that Professor Sorenson's testimony

presents sufficient evidence of irreparable harm. Professor Sorenson testified that 41 percent of Shell's customers buy only Shell gasoline, and that as a result of the debranding Shell would lose the business of loyal customers who would spend a lifetime purchasing gasoline at the Deerfield Beach service station. *See* Transcript of October 8, 1996 Preliminary Injunction Hearing at 85–94 (testimony of Professor Sorenson). The evidence offered by AZ—that Shells' South Florida sales rose in August following the debranding—is not sufficient to outweigh this testimony. Furthermore, although the credit card records Shell possesses might reflect the changing purchasing patterns of former Shell customers in the short term, they would provide an inadequate foundation upon which to establish actual, long-term damages. The Court concludes that the Magistrate Judge's reliance on Professor Sorenson's testimony was proper. Shell would suffer irreparable harm from the lost business of these brand loyal customers.

**5. Irreparable harm from the lost interest in real estate:** Having concluded that there is a substantial likelihood that Shell properly terminated the franchise agreement, AZ is essentially a holdover tenant with no legal claim to the property. The Court agrees with the Magistrate Judge that Shell suffers irreparable harm from its lost interest in the real estate located in Deerfield Beach. As stated elsewhere, "[t]o say that the loss of [a particular property] can be adequately compensated for by money damages ignores the unique nature of an individual piece of property." *Carada v. McAuliffe*, No. 92–CV–0465 E, 1993 WL 117525 (W.D. N.Y. April 6, 1993).

## II. PROCEDURAL OBJECTIONS

Defendant AZ raises three procedural objections to the issuance of a preliminary injunction. AZ contends that it was entitled to but did not receive a 90–day notice of termination, *see* 15 U.S.C. § 2804(a), and that the notice of termination did not contain a "summary statement," as required under *id.*

§ 2804(c). AZ further argues that the Court should not consider the testimony of Professor Sorenson, one of Shell's expert witnesses, on the grounds that Professor Sorenson's identity and opinions were not timely disclosed.

 1. **90–day notice:** As a general rule the PMPA requires a franchisor to give ninety-day notice of termination to a franchisee prior to a termination or nonrenewal of the franchise. 15 U.S.C. § 2804(a)(1) and (2). However,

> In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section—
>
>> (A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably applicable . . . .

*Id.* § 2804(b)(1). The reasonableness of the less than ninety-day notice is determined on a case-by-case basis. *Marathon Petroleum Co. v. Pendleton,* 689 F.Supp. 739 (N.D.Ohio 1988), *aff'd,* 889 F.2d 1509 (6th Cir.1989). In circumstances involving the sale of misbranded gasoline, courts have concluded that immediate termination is justified. *See Wisser,* 730 F.2d at 60; (selling of misbranded gasoline warranted immediate termination); *Shell Oil Co. v. Wentworth,* 822 F.Supp. 878, 883 (D.Conn.1993) (seven days notice of termination held reasonable where franchisee sold misbranded gasoline). Although the Court agrees that selling misbranded gasoline (misbranding) is more egregious than removing all Shell signs and trademarks and exclusively selling non-Shell gasoline (debranding), immediate termination is justified under the latter circumstance as well as the former. *Cf. Mobil Oil Corp. v. Ziebelbaum,* No. 84–6488 at 11–12 (slip.op.) (S.D.N.Y. Sept. 13, 1984) (debranding instead of misbranding "trade[s] one wrong for another" and allows the property to be "used for competitive purposes").

This conclusion based on the facts of this case is consistent with the purpose of the PMPA's notice of termination, which is "to give the dealer sufficient advance warning of the impending termination so that he may make appropriate arrangements," including seeking other distributors or dissolving or relocating the business. *Avramidis v. Arco Petroleum Products Co.,* 798 F.2d 12, 17 (1st Cir.1986) (citations omitted). Although nearly six months have passed since Shell sought to terminate the franchise agreement, AZ continues to sell Skipper's Choice fuel. *See Wisser,* 730 F.2d at 60 (less than ninety day notice warranted because there was no indication the franchisee would not have continued to misbrand); *Wentworth,* 822 F.Supp. at 883 (same). This subsequent conduct indicates that AZ would not have pursued an alternative course of conduct had Shell provided notice ninety days prior to terminating the franchise relationship.

2. **Summary statement:** Although the Magistrate Judge stated that "the parties agree that the notice of termination complied with the PMPA's procedural requirements," AZ contends that the notice of termination did not contain a summary statement, as required under 15 U.S.C. § 2804(c).[3] AZ argues that even if the summary statement is

---

**3.** The notice that the franchisor must provide to the franchisee at least 90 days prior to termination of the franchise relationship must conform to the provisions of § 2804(c), which requires that such notification:

 (1) shall be in writing;
 (2) shall be posted by certified mail or personally delivered to the franchisee; and
 (3) shall contain—
 (A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefore;

 (B) the date on which such termination or nonrenewal takes effect; and
 (C) the summary statement prepared under subsection (d) of this section.
28 U.S.C. § 2804(c). Subsection (d)(1) of section 2804 states that:
 Not later than 30 days after June 19, 1978, the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this subchapter, including a statement of the respective responsibilities of, and the remedies and relief avail-

not absolutely required, Shell must, but did not, prove that AZ was not prejudiced by its absence. *See Martin v. Texaco, Inc.*, 602 F.Supp. 60, 63 (N.D.Fla.1985). Shell, on the other hand, claims not only that it served the summary statement on August 5, 1996, but that under the recently adopted, less stringent interpretation of the statutory notice requirement, the summary statement is not required.

From the evidence presented the Court is unable to determine whether Shell provided AZ with the summary statement. AZ asserts, both in its objections to the Magistrate Judge's Report and Recommendation and at the hearing held before the Magistrate Judge, that it never received the summary statement. *See* Transcript of October 8, 1996 Preliminary Injunction Hearing at 153–54; A.Z. Services, Inc.'s and Antonio Aldumbide's Objection to Magistrate Judge Turnoff's Report and Recommendation on Shell's Motion for Emergency Preliminary Injunction at 12–14. On the other hand, Shell submitted a sworn declaration of R.J. Klein, a Shell employee, stating that AZ received a copy of the summary statement. *See* Declaration of R.J. Klein at 4.

■ The courts have not unanimously concluded whether the failure to provide a summary statement invalidates a termination notice. *Compare Greco v. Mobil Oil Corp.*, 597 F.Supp. 468, 471 (N.D.Ill.1984) *with Grotemeyer v. Lake Shore Petro Corp.*, 749 F.Supp. 883, 888–89 (N.D.Ill.1990). However, the Court is persuaded by the more recent cases which have rejected strict compliance in favor of a more flexible approach. *See, e.g., Amadeo v. Mobil Oil Caribe, Inc.*, 642 F.Supp. 962, 964 (D.P.R.1986) ("otherwise proper notice will not be rendered invalid for failure to include a summary statement"); *Brown v. Magness Co.*, 617 F.Supp. 571, 574 (S.D.Tex.1985) ("the statute does not contemplate an elevation of form over substance where [the dealer] has not been deprived of actual notification"). Under this flexible approach the technical defect is only

able to, any franchisor and franchisee under

of consequence if there is some showing that the franchisee has been prejudiced. *Grotemeyer*, 749 F.Supp. at 888; *Amadeo*, 642 F.Supp. at 964; *Brown*, 617 F.Supp. at 574; *Martin*, 602 F.Supp. at 63. Prejudice is established only if the franchisee suffered from the harm the summary statement was designed to prevent. *Grotemeyer*, 749 F.Supp. at 888 (a dealer that is not supplied with the summary statement suffers no prejudice if the purpose of the statutory requirement is not frustrated). Although Congress did not definitively state the purpose of the summary statement, courts have presumptively concluded that the summary statement is designed to "advise franchisees of their rights and enable them to protect their interests." *Id.*

The Court recognizes that the Northern District of Florida concluded, based on the facts presented, that the jury should decide whether an oil company had satisfied its burden of proving that the franchisee was not prejudiced by the failure to receive the summary statement. *See Martin*, 602 F.Supp. at 63 (also noting that "it would be an unreasonable construction of the statute to allow plaintiff to stand on the single technicality of lack of a summary statement to invalidate the termination if he was not thereby prejudiced"). Unlike the franchisee in *Martin*, however, here the President of AZ received a Licensiado (an undergraduate J.D.) in Ecuador and, furthermore, AZ admitted that it contacted counsel before deciding to debrand. *See* Videotape Deposition of Antonino Zaldumbide at 6, 42 (October 3, 1996). Because AZ was "apparently represented by counsel who [was] fully capable of advising [AZ] of [its] rights under the PMPA," *Grotemeyer*, 749 F.Supp. at 888, and in the absence of any countervailing evidence offered by AZ, the Court concludes as a matter of law that Shell has satisfied its burden of proving that AZ has suffered no prejudice from Shell's failure to provide the summary statement. *See also Tolland Getty, Inc. v. Getty Petroleum Co.*, No. 3:93–CV–1040, 1993 WL 402802 at *3 (D.Conn. Oct.1,

this subchapter.

1993) (termination notice which failed to include a summary statement was not invalid because the franchisee was represented by counsel and was apparently aware of its PMPA rights).

**3. Testimony of Professor Sorenson:** AZ also objects to Professor Sorenson's expert testimony on the irreparable harm issue, arguing that although Shell knew Professor Sorenson was going to testify more than a month prior to the October 8 hearing, Shell did not tell AZ that Professor Sorenson would testify until one business day before the hearing, even though Shell's counsel previously stated that he would make all of Shell's witnesses available to AZ no later than September 1. In Response, Shell argues that there is no rule mandating disclosure of witnesses prior to a preliminary injunction hearing and, furthermore, the Magistrate Judge told the parties that discovery would continue until the hearing and even suggested to the parties that they obtain expert witnesses.

The Court notes that at the August 22, 1996 preliminary injunction hearing, the Magistrate Judge expressed his concern about the irreparable harm issue and advised the parties that they could present expert witnesses at the evidentiary hearing. *See* Transcript of August 22, 1996 Emergency Motion Hearing at 16, 24, 27. At the same hearing, the Magistrate Judge ruled that the parties could continue to take discovery until the October 8, 1996 evidentiary hearing. Id. at 36. Therefore, both Shell and AZ had the opportunity to present expert witnesses. Although Shell decided to introduce Professor Sorenson as an expert witness, AZ decided not to present an expert witness. The Court will not interfere with the parties' strategic decisions. The Magistrate Judge did not err in considering and relying upon Professor Sorenson's testimony.

## III. EQUITABLE AND PUBLIC INTEREST CONSIDERATIONS

**1. Balancing the equities:** In arguing that the equitable balance should tip in its favor, AZ cites many cases for the proposition that Shell has not suffered any damages from lost goodwill because the goodwill that customers have towards the station belongs to AZ, not Shell. *See Lee v. Exxon Co. USA,* 867 F.Supp. 365 (D.S.C.1994); *Phillips v. Crown Central Petroleum Corp.,* 376 F.Supp. 1250 (D.Md.1973), *rev'd on other grounds,* 556 F.2d 702 (4th Cir.1977), *injunction aff'd,* 602 F.2d 616 (4th Cir.1979). While AZ concedes that Shell could potentially suffer damages from the loss of goodwill associated with the Shell trademark, AZ argues that no such damage has occurred here because AZ has protected the Shell trademark since the debranding. Finally, AZ argues that any financial harm suffered by Shell is minuscule compared to the complete extinction and financial ruin of AZ which would result from the issuance of a preliminary injunction. *See Phillips,* 376 F.Supp. at 1258 (balance of hardships tips in favor of franchisee).

▇▇▇▇ The Court concludes, however, that customers are attracted to the Deerfield Beach Shell station primarily by the Shell name and brand and not by AZ. A Shell station has operated at the Deerfield Beach location continuously since 1959, and AZ's debranding, although not as serious of a violation as misbranding, has nevertheless caused Shell significant harm. *See Ziebelbaum,* No. 84–6488 at 12 (debranding instead of misbranding does no more than trade one wrong for another, and causes franchisor a loss of customer goodwill).

Furthermore, AZ has not offered any evidence that any specific customer regularly frequents the Deerfield Beach Shell station because of AZ's goodwill. Shell, on the other hand, has offered evidence that the goodwill attributable to the Deerfield Beach Shell station is associated with the Shell name. *See* Transcript of October 8, 1996 Preliminary Injunction Hearing at 85–94. Finally, even though the Shell corporation is much larger than AZ, this fact alone does not overcome the risk that Shell will suffer serious harm should the preliminary injunction not be granted.

**1418**

**2. The public interest:** In 1978, Congress established the PMPA in order to establish protection for franchisees from arbitrary or discriminatory treatment or nonrenewal of their franchises. S.Rep. No. 95–731, 95th Cong., 2d Sess. 15 (1978), reprinted in 1978 U.S.Code Cong. & Ad. News 874. Congress, however, also recognized the "legitimate needs of a franchisor to be able to terminate a franchise." S.Rep. No. 95–731, at 19, 1978 U.S.Code Cong. & Ad.News 877. The Court has concluded, see supra, that AZ's debranding of the Shell gasoline station was improper under the PMPA. Consequently, the Court concludes that the public interest is best served by enforcement of the PMPA and by the assurance that valid contracts will be enforced. Although the Court also agrees with AZ that the public interest is served by fair competition and low gas prices, these interests are meaningless absent the enforceability of voluntary contracts entered into between sophisticated economic actors.

**3. Equitable considerations:** The Court rejects out of hand AZ's contention that Shell's conduct in a prior business dealing with AZ should bar Shell from obtaining equitable relief. There is no nexus between the alleged bribe, which may have occurred in 1985, and this case. See Shell Oil Co. v. Babalis, No. 93 C 6352, 1994 WL 411733 *5 (N.D.Ill. Aug.4, 1994) (rejecting the unclean hands defense in a claim raised under the PMPA because the unclean hands doctrine "only applies if there is a direct nexus between the bad conduct and the activities sought to be enjoined").

## IV. OTHER CONSIDERATIONS

**1. Breadth of injunction:** AZ argues that the scope of the Magistrate Judge's recommended injunction is too broad. According to AZ, instead of recommending AZ's eviction, the Magistrate Judge should have required AZ to resume selling Shell-branded fuel. If allowed to resume selling Shell-branded fuel, AZ argues that it can litigate its antitrust claims while maintaining positive employee and customer relations. Shell, on the other hand, contends that it validly terminated the franchise relationship because AZ materially breached the franchise agreement, and AZ's subsequent refusal to vacate Shell's property warrants AZ's eviction.

Whether AZ can be evicted from the Deerfield Beach property depends on whether Shell could validly terminate the franchise agreement, since AZ was not entitled to cure the breach of the franchise agreement. See O'Shea v. Amoco Oil Company, 886 F.2d 584, 595 (3d Cir.1989) ("Section 2802(b)(2)(A) allows for termination without requiring a chance for cure if a franchisee breaches a reasonable and material contractual term . . . ."); Wisser, 730 F.2d at 58–59 (PMPA creates no "right to cure" material breaches of contract). Because of the substantial likelihood that AZ committed a material breach of the franchise agreement, and the substantial likelihood that Shell was legally permitted to terminate the franchise agreement, an Order granting Shell's requested injunction is warranted.

**2. The bond requirement:** Having concluded that this Court has jurisdiction to resolve a dispute on behalf of the franchisor, see supra, this Court also reaches the consistent conclusion that it may require the franchisor to post a bond prior to the issuance or continuation of any equitable relief. Cf. 15 U.S.C. § 2805(b)(3) (authorizing courts to require a franchisee to post a bond before issuing equitable relief). The Court has been unable to discover any decision requiring a franchisor to post a bond under the terms of the PMPA. "The decision whether to require a bond, as well as the amount, is discretionary." Barnes v. Gulf Oil Corp., 824 F.2d 300, 307 (4th Cir.1987). The Court concludes that, given the apparent financial strength of the Shell Corporation, a bond is not required. Should Defendants request a bond, they may file, no later than *February 18, 1997,* a memorandum of law on the amount of bond that Shell should be required to post in conjunction with the issuance of this preliminary injunction.